**G. L. WILSON BUILDING COMPANY,**
Plaintiff,

v.

**Robert LEATHERWOOD, III, Receiver of Paul L. Von Cannon, Inc., First Union National Bank, W. J. Fisher, Trustee, Small Business Administration, G. D. Holden, Trustee, Robert B. Horning, Trustee, W. Paul Holt, Jr., Trustee Forwell Corporation, Small Business Administration, and United States of America, Defendants.**

Civil No. 2370.

United States District Court
W. D. North Carolina,
Bryson City Division.

May 4, 1967.

Collier, Harris & Collier, Statesville, N. C., T. A. Uzzell, Jr., Asheville, N. C., for plaintiff.

Robert Leatherwood, III, Bryson City, N. C., for receivership of Paul L. Von Cannon, Inc.

Herbert L. Hyde, Asheville, N. C., for First Union Nat. Bank and W. J. Fisher, trustee.

William Medford, U. S. Atty., Asheville, N. C., for United States, Small Business Administration and Robert B. Horning, surviving trustee.

W. Paul Holt, Jr., Sylva, N. C., for Forwell Corp.

## MEMORANDUM OF DECISION

WARLICK, Chief Judge.

This is a civil action instituted in the Bryson City Division of this court, on May 28, 1965, in which plaintiff seeks to recover the alleged sum of $285,798.95, with interest, from the defendants, as payment in full under the terms of a contract theretofore executed and entered into by and between plaintiff and one of the defendants as hereinafter appears. The Complaint filed on that date sets out three alleged causes of action, all seeking relief but approaching the remedy differently as the actions indicate. Attached to the complaint and as a part thereof, plaintiff filed its "Notice of Lis Pendens" in the office of the Clerk of the Superior Court of Jackson County, North Carolina, and among other things therein sets out by metes and bounds a full and complete description of the real property involved and a notice and claim of a statutory lien, alleged as being filed in the office of the Clerk of the Superior Court of Jackson County, all as is required by G.S. § 44–38 of the Laws of North Carolina. Said notice of Lis Pendens being filed under the provisions of Sec. 1–116 of the General Statutes of North Carolina. This notice was filed December 10, 1964.

This action stems from an undertaking under the terms of the contract on the part of plaintiff, to erect and construct a furniture factory building and equip it with the requisite machinery, at the selected site in Jackson County, so that it obviously would when completed, as the evidence tends to show, afford employment in a Distressed Area, for the members of the Eastern Band of Cherokee Indians residing on the Qualla Boundary as well as other individuals living in that section. It involves a complicated set of

facts and obviously such would require that a thorough examination be had and full Findings of Fact be made.

The matter was heard at Asheville, by agreement, and for convenience at the summer 1966 session of this court, and following the completion of the transcript and the submission to the court of proposed findings of fact by counsel, representing the various parties, together with a full and complete study, the following are facts found by the Court and the applicable conclusions of law, all as is required by Rule 52, Title 28 U.S.C.

Plaintiff is a North Carolina corporation, with its principal office and place of business in Statesville, in the Western District of North Carolina.

Paul L. Von Cannon, Inc., is likewise a North Carolina corporation and its actions are the subjects of this controversy; prior to having been placed into receivership, it was undertaking to locate and build a furniture manufacturing business in Jackson County, North Carolina.

Robert Leatherwood, III, at the time of the hearing, of this controversy, was the Receiver of Paul L. Von Cannon, Inc., and as such was acting under the direction of this court.

The First Union National Bank is a banking institution chartered under the laws of the United States, with its principal office in Charlotte, North Carolina, but operating branches in many North Carolina cities, including Sylva, in Jackson County.

The Small Business Administration (SBA) is an agency of the Federal Government, and among other things is principally engaged in lending money to small business corporations and individuals, in need of that type of loan.

W. J. Fisher, an individual, is trustee for the First Union National Bank in the obligation hereinafter included in these Findings of Fact.

G. D. Holden and Robert B. Horning as individuals are parties to this action for that they were named as co-trustees for Small Business Administration. G. D. Holden is now deceased and his death being suggested under Rule 25(a) (1) the surviving trustee Robert B. Horning was empowered to act alone in such office.

W. Paul Holt, Jr. is made a party defendant to the action on account of his having been substituted for Orville D. Coward as trustee in that certain deed of trust now assigned to Forwell Corporation by Jackson County Industries, Inc., and the Eastern Band of Cherokee Indians. Forwell being the owner of that certain deed of trust executed by Paul L. Von Cannon, Inc. as is shown by the recordation on January 23, 1964, in the Jackson County Registry in Book 277, page 371.

The United States through its lending agency Area Redevelopment Administration (ARA) and the Small Business Administration (SBA) agreed to lend Paul L. Von Cannon, Inc. hereinafter referred to as Von Cannon, certain monies conditioned on its construction and equipment of a furniture plant in Jackson County, North Carolina; this agreement being made in view of an application previously made by Von Cannon.

The evidence shows that conversations and discussions of this contemplated business transaction had been going on for some time between the parties, including plaintiff whose draftmen and agents had aided Von Cannon materially in suggestions, drafting and drawing of plans of the proposed plant, the need and type and character of operation, and in fact plaintiff and its engineers and employees were largely responsible for the final drawing and completion of the contemplated plans of the plant. The plans were acceptable and accordingly adopted by all interested parties herein.

After a full submission of the proposed plan together with the estimated cost thereof, the government, on October 23, 1963, through its lending agency, Small Business Administration, determined that the amount of the loan which it was agreeable to make to Von Cannon would be $765,000.00, for the sole purpose of the payment of 65% of Von Cannon's cost to construct and equip such plant.

Prior to October 23, 1963, Von Cannon, as was required by the government had obtained a commitment for a loan in the sum of $235,400.00 from the First Union National Bank which represented a 20% payment of the cost of the erection of the contemplated furniture plant. The remaining 15% of the aforesaid cost was to be taken care of by Von Cannon and the Jackson County Industries, Inc. and the Eastern Band of Cherokee Indians, which totalled $117,700.00, and was fully paid among the first disbursements, as the work progressed.

On October 25, 1963, plaintiff, G. L. Wilson Building Company, and the defendant, Von Cannon, entered into a contract to fully construct and equip the aforementioned furniture plant in Jackson County, North Carolina, for the total sum of $1,130,918.00, which contract was completely reviewed and approved by the representatives of Small Business Administration, at which time it was determined that the aforesaid contract price which was to be paid plaintiff for the construction of the plant and the machinery installed was not only reasonable but was completely within the project specifications, and within the total authorized cost by the government.

On October 28, 1963, in furtherance of the aforesaid contract, which incidentally had been in the study and making for some time prior to its execution, plaintiff began work upon the project by placing all necessary stakes indicating the grading to be done, bringing machinery and tools and necessary equipment upon the project, and the erection of a sign supplied by the government on such project indicating that such was a government project, and on the next day, October 29, ground breaking ceremonies were held upon such project.

On November 20, 1963, in view of First Union National Bank's commitment with respect to a loan, Von Cannon executed and delivered to said bank its promissory note secured by a deed of trust in the total sum of $235,400; and to Small Business Administration its promissory note and deed of trust in the amount of $765,000.00. Both of these deeds of trust were recorded in the public registry of Jackson County, North Carolina on November 20, 1963, the record indicating that First Union National Bank's deed of trust was prior to that of the deed of trust to the trustees for the Small Business Administration,—one being recorded at 10:55 a. m. and the second at 11:00 a. m.

Previously thereto a deed in fee simple to the lands on which the furniture plant was to be erected was executed and delivered by the owners thereof, R. Denver Sutton and his wife to Jackson County Industries, Inc. and was recorded at 10:-35 o'clock on the morning of November 20. Correspondingly on the same morning of November 20, Jackson County Industries to whom the deed from Sutton and wife had previously been executed, conveyed the same lands by deed with full covenants of warranty to Paul L. Von Cannon, Inc. and such deed was recorded at 10:40 o'clock, all of which adds up to the fact that the deed to the land involved was placed to record and subsequently the first and second obligations were correspondingly placed to record and the title thereupon together with the obligations became full and vested, all as appears from the public registry of Jackson County.

Thereafter and at 1:00 o'clock in the afternoon of November 20, 1963, actual construction work was begun by plaintiff, when the beginning of the actual grading operations was had.

Following the many steps obviously taken in bringing all of the arrangements and understandings of the various parties to this rather complex undertaking and either prior to or simultaneous with the beginning of the construction work, the government through some agency interested in this project assigned one Art Capper, an Evaluation Engineer and an agent and employee of the government, to supervise this work from its beginning and directed among other things that all work done by the plaintiff in the development of this project be fully and completely under his direction, supervision,

inspection, and subject to his full approval. Capper, as an Evaluation Engineer, was required by the government to not only be continuously on the job as nearly as could be possible, but to make periodic reports concerning the progress made on this project by plaintiff, to Edgar Allen, an agent and employee of the government, and Regional Counsel of SBA in Richmond, Virginia. Copies of such Progress Reports by Capper were to be furnished to Allen, and to First Union and those reports were wholly relied upon by said bank as well as the government and both the government and First Union disbursed monies thereunder in the amounts set out and approved in such Progress Reports.

After placing necessary stakes indicating the grade levels to be set up, bringing machinery and tools and other equipment on the ground as has heretofore been found, and following the ground breaking ceremony on October 29, and the actual beginning of the grading operations on November 20, 1963, plaintiff continued to perform its obligation under the contract and was on request therefore, paid for its work done and performed through January 1964, from monies of Von Cannon, Inc., and other Jackson County organizations, which payments, as required by the government and First Union, had by that time exhausted such fund in its entirety.

Plaintiff thereafter continued to work regularly on the construction of said project and submitted what was its fourth bill dated March 1, 1964, and in the amount of $22,193.64, to Art Capper, who approved such bill for payment.

On April 1, the fifth bill for work done on such project was presented by plaintiff to Capper, the Evaluation Engineer, which he likewise approved for payment in due course and without any delay.

At that time payment had not been received for the fourth billing dated March 1, 1964, and plaintiff feeling somewhat insecure with two amounts due and unpaid, and in order to protect itself, stopped all work on the project on April 3, 1964, and thereupon requested a meeting with SBA to determine its position and to more fully understand the methods and time of payment. Such meeting was arranged and was held on May 14, 1964, in Richmond, where plaintiff met Edgar Allen, and another Government agent and employee, a Henry Troxler, in the offices of the Small Business Administration. Before this meeting plaintiff had submitted its sixth bill to Capper who likewise had approved such for payment, having previously inspected the advance in work and being fully aware of the fact that such bills were due for approval and payment. On May 14, 1964, when plaintiff met in Richmond, as set out herein, with Allen and Troxler, its fourth, fifth and sixth bills, totalling $135,060.99, all of which had been previously approved, by Capper, were fully reviewed, and likewise determined pursuant to the contract price. The proportionate share of the construction costs to be paid by the government and First Union was studied, correlated, determined and found correct. At such meeting both Allen and Troxler promised that plaintiff would be paid the total amount of the aforesaid three billings and likewise all future billings for such work done and performed on the project as submitted by plaintiff and approved by Capper. At this meeting it was further agreed and plaintiff was so assured, that its future bills would be paid and Allen and Troxler then and there reciprocally promised and agreed to make all future checks payable jointly to plaintiff and Von Cannon, Inc. Then it was that plaintiff, relying upon such promises and assurances as made by these government agents with full authority for payment as work progressed, returned to work upon the project.

Following such and on May 26, 1964, plaintiff met with certain officials and employees, who were in a position to and were legally authorized to act for First Union, and these officials promised and agreed that plaintiff would be paid First Union's share of the fourth, fifth and sixth billings and all the future bills rendered when properly prepared and

submitted by plaintiff and approved for payment by Capper and that First Union would jointly make all checks payable to plaintiff and Von Cannon, Inc., and deliver such checks for its portion of such billing.

At such meeting plaintiff actually received the government's check in the sum of $116,815.84, in payment of its share of said fourth, fifth, and sixth bills heretofore rendered and submitted and plaintiff likewise received from First Union its check for $35,943.34, its share then due on said three bills rendered and approved.

First Union at such meeting advised and informed the plaintiff that it was relying completely upon the government for inspection and approval of the work done by it and the disbursement of its part of the construction costs in the agreed pecentages.

Thereafter relying upon the aforesaid promises and assurances of both the government and First Union, plaintiff continued its work on this project and made a fine measure of progress in the fulfillment of the contract.

On June 1, 1964, plaintiff submitted its next bill in the sum of $228,871.60, to Capper, who in turn, on finding the bill correct and the work and other performances done, approved such for payment and on June 17, such bill was paid by two checks, one issued by the government in the sum of $175,019.93, and one by First Union totalling $53,851.67. These payments being in line with the deeds of trust executed by Von Cannon, Inc.

Subsequently and on July 1, 1964, plaintiff again prepared and submitted its eighth bill to Capper, who being familiar with the work done, approved such bill for payment, and on August 15, plaintiff was paid its eighth bill by check for $272,431.17, drawn by the government and a check in the sum of $83,824.-98 by First Union, each made payable as had been previously agreed to plaintiff and Von Cannon.

At the time when the eighth bill was submitted for payment and on July 3,

the exterior of the building was reasonably complete and on such date a formal dedication was held and a fine ceremony had, to which many dignitaries were invited, and a very elaborate program enjoyed. Although at such time approximately one half million dollars of machinery had not yet been fully received, installed, or actually billed to either the government and First Union, by plaintiff, though it was at that time and had for some time been ordered and was subsequently all received and installed.

On August 18, plaintiff submitted its ninth billing for $150,383.11. Capper made a thorough job inspection and on August 28 such bill was approved for payment and forwarded to Allen at the office of SBA in Richmond.

When this payment was not received in due time a representative of plaintiff contacted Allen who then promised that payment of such amount as reflected in the bill would shortly be made. Additionally such promise of payment by Allen was made known to the firm of Coward and Coward, Attorneys, who handled the project, and likewise such information regarding payment was given to plaintiff's counsel, Collier and Harris of Statesville. Allen, however, requested that Collier not inform Von Cannon that payment of such billing would be immediately forthcoming.

Later, and on October 5, Allen told plaintiff that he had requested a check from the appropriate government authorities in the amount of $102,202.04, which would be in full of the government's part of plaintiff's bill of August 18, the difference between that sum and the amount of the bill as submitted to be taken care of by First Union as was understood by all involved in this action. Plaintiff relying fully upon the information had and the authority given, continued to work and completed the project in its entirety, including the installation of all machinery by October 20, 1964, when a pre-final inspection was made by Capper.

Following that pre-final inspection Edgar Allen who had come to Sylva to par-

ticipate in such pre-final inspection, again promised plaintiff that payment would be made for all the remaining amounts due, including of course plaintiff's ninth bill rendered on August 18, 1964.

Thereafter, on November 10, 1964, a full, final and complete inspection was made by Capper and he found that the project was complete in all respects and as such fully acceptable to the government and its agency, the SBA, and approved such payment as plaintiff's final and tenth billing in the sum of $111,732.-59, informing plaintiff on such date that he would issue a final certificate of satisfactory completion of said project and deliver copy thereof to plaintiff. For some reason unknown to plaintiff, Capper was thereafter specifically ordered by Allen not to issue such final certificate.

Subsequently and on December 10, 1964, plaintiff not having received payment of either the ninth or tenth bills as submitted, had its attorneys prepare and file a written notice of lien with the Clerk of the Superior Court of Jackson County, North Carolina, in the manner and form prescribed by the laws of North Carolina, and such prepared lien when filed was recorded in Book No. 1, at page 476, of the Jackson County Lien Record.

In January 1965, plaintiff still not having been paid for its ninth and tenth bills, aggregating $262,115.07, had a meeting with Allen in the Collier Law Offices in Statesville, North Carolina, when Allen again promised plaintiff and its attorneys that such bills as submitted would be paid.

Plaintiff obviously not being paid the amounts contained in the last two bills, and on the government's refusal to pay same and First Union relying upon the government's position, likewise refused to pay,—this action was then instituted and subsequently came to trial.

During the period of work done under the contract between plaintiff and Paul L. Von Cannon, Inc., three payments were made by Von Cannon and the Jackson County Industries, and the Eastern Band of the Cherokee Indians in the total amount of $129,763.09; this exhausted the amount of the third note and deed of trust. Thereafter SBA and First Union each made three payments to plaintiff for work done and materials and supplies and machinery furnished and installed, in the total sum of $737,886.93; Making total payments to plaintiff in the sum of $867,650.02; the difference between the contract figure and that paid as above is the amount now sought to be recovered in this action.

During a greater portion of the time that plaintiff was engaged in erecting this project, SBA knew that Von Cannon had not fulfilled some of the conditions embraced with respect to the erection of this furniture plant and that on some several occasions he had failed to comply with the requirements of the loan authorities, however at no time was plaintiff informed of such failure on the part of Von Cannon to comply and throughout the whole of the period involved herein plaintiff was allowed and permitted to continue expending its monies for labor and materials and machinery in the completion of this project. Naturally all of this added to the enrichment and betterment of the security held by First Union as well as that of the government and on the contrary increased plaintiff's loss and operated to its great detriment. Actually the evidence shows and I so find that it was not until after plaintiff had completed the project and it had been approved as such by Capper that Von Cannon and plaintiff were informed and advised that the remainder of the undisbursed funds in the government's possession in the amount of $200,735.06 and funds similarly undisbursed and in possession of First Union, in the amount of $61,380.64, would not be disbursed in full payment of the construction of the building, the installation of machinery, and the completed contract.

Here, it is worthy of note that throughout all of the period of the construction of this project under the terms of the contract that plaintiff acted whole-

somely and properly and without any discrepancy or failure to fulfill its entire contract according to its terms.

The plans and specifications of the contract required a sewage disposal system which would meet the requirements of the Health Department of North Carolina. Later when the State authorities began to inspect the proposed sewage system it was determined that such system as was embraced in the contract would not be adequate to take care of the disposal from the entire plant, and being found inadequate by the Health Department, and that in order to meet the requirements of the Stream Sanitation Commission of North Carolina it would be necessary to install a sewage treatment plant and abandon the septic tank disposal. This was determined to be an extra item to the contract, and thereupon plaintiff agreed with Von Cannon that it would be paid for such sewage treatment plant upon the basis of it being an extra, which would obviously be contingent upon satisfactory arrangements being made with SBA for its approval. However without regard to the different matters involved as the evidence tends to show in this situation, and the requirements, etc., plaintiff now seeks no recovery for the extra amounts incurred in the sum of $23,683.88, but only claims the amount it is due under the prime contract.

A National Cash Register Bookkeeping Machine was an item required in the original contract. It was ordered, and delivered, but when the property was ultimately sold to Drexel, this item was excluded from the articles sold and was returned to and accepted by the National Cash Register without cost. This was billed to plaintiff at the invoice price of $7,200.42, and such amount is now not sought as a part of recovery by plaintiff.

Von Cannon during the period of the construction work by plaintiff, and as the work progressed toward a completion, began to purchase, through some of its agencies, lumber and other needed commodities with which to manufacture the contemplated line of furniture,—actually making samples and other designs and models of furniture to be finally produced and sold, and of course accumulated a good many unpaid bills for articles purchased of that type, for labor performed by persons employed by Von Cannon, etc.

During the latter part of December 1964 certain creditors whose accounts had not been paid, filed various actions against Von Cannon seeking to recover for such articles sold and delivered and one among those prayed for a recovery in an amount of approximately $15,000 and sought the appointment of a receiver, on allegations that Von Cannon was insolvent.

Robert L. Leatherwood III, was appointed by a Judge of the Superior Court as temporary receiver and later such appointment was made permanent.

Thereafter on February 2, 1965, William Medford, United States Attorney filed a petition for removal to this court, which petition was granted on February 4, and thereafter the matter was docketed herein.

Subsequently and in an orderly process the Receiver under the orders of the court, took over the administration of the estate of the insolvent Von Cannon and thereafter administered it properly both before and after the institution of this action by plaintiff.

On November 18, 1965, the United States on behalf of its agency, SBA, and through the United States District Attorney for the Western District of North Carolina, filed its motion to sell the property described in the deed of trust from Von Cannon to the trustees for SBA. Such motion was allowed.

Among other things it was ordered by the court:

1. That the sale be conducted within ninety days following the issuance of this order.

2. That the sale shall be made subject to the deed of trust by Von Cannon to the trustees for the First Union National Bank.

3. That said sale shall also be made subject to any valid laborers' mechanics', and materialmen's lien that might be perfected in the action at Bar.

Following this order a proper advertising of the property was had and a trustee's sale was conducted on January 10, 1966, whereupon the SBA became the last bidder for said property in the sum of $575,000.00.

Later by a general warranty deed SBA sold all of said property to Drexel Furniture Company, a reputable manufacturer of fine furniture, for $550,000.00 and agreed to hold Drexel harmless specifically against plaintiff's lien. Subsequently on being paid for said property by Drexel, SBA paid First Union $189,-401.21, in full, with the exception of the sum of $10.00, which for some reason not particularly understood, and surely never explained to the court, remained an unpaid balance.

The balance of the proceeds of such sale has since been disbursed to the Treasurer of the United States.

The court further finds that SBA through its duly authorized agent, legally agreed to save harmless First Union National Bank on any possible liability growing out of the transactions involved herein.

According to an original understanding, as agreed to by Von Cannon and SBA, it was determined that a portion of Von Cannon's operating capital was to be acquired by a sale of its stock; plaintiff agreed to subscribe to $60,000.00 of such stock and to pay for it in direct ratio to the money it received from the government from payments of the bills rendered by it. Plaintiff carried through in good faith and actually purchased $47,-100.00 of such stock and certificates for such stock were issued, and delivered to subcontractors of plaintiff. All of these circumstances of facts were fully revealed to, discussed with, approved, and authorized and requested by SBA, and the Government refused to deliver its checks in payment to plaintiff until it paid for the portion of such subscribed stock.

The only bright picture which appears on this legal horizon is that which comes from the final sale of the property to Drexel Furniture Company, for that it is recognized as one among the leading furniture manufacturing concerns in America, and through its continued operation those, for whom the government, represented by SBA, was undertaking to aid in an undeveloped area and in an impoverished section, would finally reap the benefits as will come from a going concern under good management, giving employment to the employables; though it must not be overlooked that in so doing the government through its agency, SBA, lost approximately $600,000.00, either carelessly, ineptly, or through its failure to providentially attend to the business entrusted to it.

It evidently would appear of value to summarize the Findings of Fact contained in the first eleven pages of this Memorandum of Decision.

The Area Development Administration (ARA) and the Small Business Administration (SBA), in its desire to carry out the mandates of the Congress, learned among other things from a study made that Swain and Jackson Counties in the Western Section of North Carolina, constituted a distressed area within the meaning of the Act, due almost wholly to a lack of employment for members of the Cherokee Indian Nation and to the poverty stricken peoples of that area; under such information it was determined that employment of these people would be the basic answer to the problems presented. With that line of thinking, representatives of these Federal Agencies, either contacted or were approached by Paul L. Von Cannon, a member of a furniture manufacturing family; from conversations and investigations made by SBA the facts involved in this controversy were set in motion. It was decided among other things that with the experience which it was thought Von Cannon possessed, that a furniture manufacturing plant would adequately provide the need for these communities. Various conferences were had and further studies

were made, all of which brought into being the mechanics involved in purchasing the land and financing the building and the machinery needed.

A likely site was found in Jackson County, suitable for the type and character of plant contemplated. Plans were drawn which met the requirements of Von Cannon and were in line with the thinking of representatives of the Two Federal Agencies, and on the architect's drawings being fully studied and adopted, plaintiff's bid to construct the building, install the machinery, and complete the contract was accepted.

Previously thereto SBA, acting as a sparkplug in the matter, proceeded in making all necessary financial arrangements.

Through such arrangements it was required by SBA and such was met by its further actions, that a first loan would be made to Von Cannon by the First Union National Bank. That SBA would accept a second deed of trust, executed by Von Cannon, in the amount as shown and finally that the Cherokee Indian Nation and the Jackson County Industries, Inc. would in line with the agreement, advance monies in the amount found in these findings of fact, and accept as its collateral a third deed of trust executed by Von Cannon. The amount embraced in these three notes secured by deeds of trust and executed by Von Cannon were all payable to it and were the almost identic amounts then found necessary to pay plaintiff in full when the contract between it and Von Cannon had been completed and the manufacturing plant turned over to Von Cannon.

It was further determined that the amounts involved in the three deeds of trust would only be payable to plaintiff as the materials were furnished and the work and labor performed in the completion of this contract.

It is further found as a fact that the amounts embraced in these three deeds of trust were actually hypotheticated in a sense for the purpose and that only of compensating plaintiff under the terms of its contract with Von Cannon, and that all of those involved in such were fully acquainted with the terms thereof, and understood its full meaning. That in furtherance of the contract it was agreed that the monies available from the third deed of trust were to be first expended and thereafter the sums coming from the first and second deeds of trust would be paid plaintiff in the proportions as agreed upon, all as appears in the Findings of Fact.

The plaintiff completed its contract originally entered into with Von Cannon; the same was accepted as a completion of the contract by representatives of SBA and the First Union National Bank, and those representatives authorized the agencies disbursing the funds to make payments to plaintiff in full of such contract; that up until this time no complaint whatsoever was made indicating any failure on the part of plaintiff to comply fully with its contract, other than by small corrections which were agreed upon and which were fully complied with. Representatives of the agencies involved testified in open court that there had been no failure on the part of plaintiff to complete its contract and that such was entitled to acceptance and on acceptance to payment in full to plaintiff.

And finally, for the life of me, as this matter has fully developed, I cannot come up with any valid reason why a further investigation of the financial affairs of Von Cannon was not originally made. Had such been undertaken it probably would have revealed a different state of facts and certainly the troublesome matters that have arisen from this controversy would never have come into existence. That failure, however, must be one among the things which some federal agencies seem not only to possess in volume but to use extensively in their activities.

### CONCLUSIONS OF LAW:

The plaintiff seeks from among its several allegations as will be presently shown to perfect a lien on the proceeds of the trustee's sale of the Von Cannon

property, and thereby to secure for it on that remedy a recovery in full compensation.

Mechanics', Laborers' and Materialmen's Liens, found in the General Statutes of North Carolina, begins with No. 44–1 where these rights first appear to have been enacted by the General Assembly of North Carolina. On buildings and property, real and personal.—

> Every building, built, rebuilt, repaired or improved, together with the necessary lots on which such building is situated, and every lot, farm or vessel, or any kind of property, real or personal, not herein enumerated, shall be subject to a lien for the payment of all debts contracted for work done on the same, or material furnished. (1869–70, c. 206, s. 1; Code, s. 1781; 1901, c. 617; Rev., s. 2016; C.S., s. 2433.)

is found the first step in one's statutory right to obtain relief through such liens.

Thereafter § 44–43 entitled Action to enforce lien; perfection of lien by filing claim with receiver.—

> Action to enforce the lien created must be commenced in the court of a justice of the peace, and in the superior court, according to the jurisdiction thereof, within six months from the date of filing the notice of the lien. But if the debt is not due within six months, but becomes due within twelve months, suit may be brought or other proceedings instituted to enforce the lien in thirty days after it is due. *Provided, when the assets of the debtor against whom the lien was created are in the hands of a duly appointed receiver, the lien may be perfected by the filing of a claim with the receiver within the times described above, without the necessity of bringing action.* (1868–9, c. 117, s. 7; 1869–70, c. 206, s. 5; 1876–7, cc. 250, 251; Code, ss. 1785, 1790; Rev., s. 2027; C.S., s. 2474; 1961, c. 972.)

These statutes set out the way and manner in which a lien can be perfected under North Carolina law.

Obedient to and in line with these two enabling statutes the evidence showed conclusively that the actual work of construction of the buildings under the contract herein was fully completed and final inspection was had on November 18, 1964. That on December 10, 1964 plaintiff filed its statutory lien notice as is required and subsequent thereto and on May 29, 1965, filed its action to enforce its lien against the land and the buildings which had been constructed. This was within the six months period of the date of the filing of its notice of lien. Rural Plumbing and Heating Co. v. Hope Dale Realty Co., 263 N.C. 641, 140 S.E.2d 330.

Following the awarding of the contract by Von Cannon to plaintiff it, on October 28, 1963, began work on such project under the terms of the contract and on that date installed all stakes necessary for grading under the engineer's locations, and placed stakes, tools, machinery, and other necessary equipment upon the property on which the building was to be erected. In addition thereto, and following the instructions and directions of a government representative, a sign supplied by the government was placed upon such property stating among other things that such project then begun to be developed was a government project. On the following day, October 29, 1963, ground breaking ceremonies as previously advertised and to which much of the public had been invited, were held upon such property, which for all intents and purposes I conclude as a matter of law, was the actual date on which construction of the project was begun.

██ There can be no doubt from the evidence in this case, and I conclude as a matter of law, that plaintiff is entitled to have and recover judgment against Robert Leatherwood, III, Receiver of Paul L. Von Cannon, Inc., in the full amount of $254,915.28, which represents the balance due under the construction and equipment contract involved herein. This is not contested by any of the parties to the controversy, in fact admissions to that effect are made, based on the general agreement of all parties.

Obviously since the receivership has been closed, and any amounts held by the Receiver disbursed, there is no fund in such receivership available for the satisfaction of such judgment. However I conclude that such judgment would have constituted a lien upon the realty and personal property in question. With this idea in mind the government entered into a stipulation when plaintiff sought to bring Drexel Enterprises, Inc. into the action, and actually had received permission so to do by making it a party defendant. That it was not necessary to make Drexel Enterprises, Inc. a party since the government in its deed of conveyance to Drexel and also by the statements of its representative that it would fully protect Drexel at all stages of this action at bar, which obviously removes plaintiff's right to recover against the land and buildings itself and forces it to the fund received from the sale of the premises.

■ Surely and certainly the First Union National Bank must be classified as a non-governmental party and under such classification and in the sections of the North Carolina Laws cited herein, I conclude that it as such defendant is liable to the plaintiff and plaintiff is entitled to have and recover of it the unexpended fund arising from said deed of trust in the amount of $61,780.01, the difference between $235,400.00, the face amount in the deed of trust and the amounts which were paid out by check to Von Cannon and plaintiff in the sum of $173,619.99.

■ When we come to the governmental agencies ARA and SBA, we are confronted with a different situation in that we must apply federal rather than state law, and must obviously reach a different conclusion than that arrived at in the above First Union National Bank determination.

The conclusions made herein with respect to the liability of the First Union National Bank to plaintiff were predicated upon a lien perfected as a matter of state law. However I conclude that U.S.C.A., Title 31, § 191, entitled "Priority established" is that rule of law which would govern any claimed liability of any agency of the federal government. It reads as follows:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed. R.S. § 3466."

To say differently, federal law would prevail and state law would have no application with regard to the liability of those defendants named as such and representing the United States.

■ It has always been the manifest purpose of the statute, in force since 1797 without significant modification "is simply to protect the interest of the Government in collecting money due to it" where the property of an insolvent debtor is involved. W. T. Jones & Co. v. Foodco Realty, Inc., 4 Cir., 318 F.2d 881, (1963), and a long line of cases therein set out.

Similar rulings have been held in many decisions and in our own Fourth Circuit we find a similar statement from a well reasoned opinion by Chief Judge Sobeloff,

"We are likewise inclined to doubt that any exception can be carved out of the sweeping language of section 191 which would allow an unforeclosed mechanic's lien, however labelled, to defeat the absolute priority secured to the United States by the statute." W. T. Jones and Co. v. Foodco Realty, Inc., supra.

It further appears in Jones v. Foodco, supra, and so determined,

"The federal insolvency statute being applicable it is dispositive of the entire case. In the first place, it was established long ago that state laws purporting to fix priorities among lienholders must yield to section 191 in any nonbankruptcy insolvency proceeding where it is applicable and seasonably invoked by the United States."

It might be said that the pleadings of the governmental defendants did not with a full degree of particularity contain such specific allegation, however later during the hearings and certainty in the brief filed, the government contends that § 191 is applicable and therefore relies upon it in its entirety.

■■■ It is thus made to appear from this line of reasoning that plaintiff cannot recover from the defendants, other than the Receiver of Von Cannon and the First Union National Bank under the theories advanced by plaintiff with respect to the matter of its lien.

However, there are two sides to the coin, even though its fine content has been at least partially if not wholly removed and false metallic materials substituted.

I now approach my conclusions of law from a different angle but with the idea of travelling the same route.

■■■ One among the great maxims which has been a conventional matter down through the years is that "he who seeks equity must do equity" and that additionally, "he who comes into equity must come with clean hands". Those two maxims to me are certainly such as fit the facts in this case as clearly and as well as a glove fits the hand, in that this is a case that seemingly is different than those ordinarily arising either in law or equity and somehow or other is a peculiar and extraordinary case which has arisen in the complex and diversified affairs of business men; and must be acknowledged to come within the legitimate powers of a court of equity because justice cannot otherwise be done between the parties. I refer to plaintiff's right as I see it to proceed to a recovery under the doctrine of equitable lien.

"Equitable liens arise either from written contracts, which show an intention to charge some particular property with a debt or obligation, *or are declared by a court of equity from the facts and circumstances of the case,* and do not depend upon possession, as do factors' liens and other liens at law." Garrison v. Vermont Mills, 154 N.C. 1, 69 S.E. 743, 31 L.R.A.,N.S., 450 (1910). See also Fulp v. Fulp, 264 N.C. 20, 140 S.E. 708 (1965) and Burrowes v. Nimocks, 35 F.2d 152 (4th Cir. 1929).

■■■ Of course it is generally known that no identic form or phraseology is necessary to create an equitable lien for that a court of equity always looks through the form to the substance of the transaction, and it would appear beyond question that the facts and circumstances of this case represent an area where equity should act under the doctrine of an equitable lien, thereby recognizing the right of plaintiff to have the specific funds herein applied to the obligations that arise from the work done and materials furnished.

Here let's just review for a moment how plaintiff in a sense was led to its great financial distress.

From the time when the first funds had been expended as available under the third deed of trust, continuing delays seem to have been in vogue in the matter of subsequent payments. However they were progressively made from the funds arising proportionately as agreed under the first and second deeds of trust, until August 15, 1964, when the last payments were made from the funds due Von Cannon under these two deeds of trust. These payments were for the previous billings up to and including the 8th, submitted bill, leaving two additional billings, the 9th and 10th, which total that amount sought herein as unpaid. However Allen promised on any number of occasions that payments would be

forthcoming and as late as October 5, 1964, Allen informed the president of plaintiff that checks had been requested and that compensation would be made. Plaintiff continued to work and completed this project in its entirety including the installation of all machinery, embraced in the contract, as heretofore set out.

When the building and equipment were inspected by Capper, and later by Edgar Allen, who came from Richmond for that purpose, both again promised that payment would be made in full for all of the remaining amounts due; and as late as November 10, 1964, Capper made a final inspection and finding that the project was completed in all respects and acceptable to the United States, approved for payment plaintiff's final ninth and tenth billings in their aggregate, and informed plaintiff that a final certificate of satisfactory completion of the project would be delivered.

Under these promises and pursuant to the contract final completion came about.

Thus it appears from all the facts that plaintiff who seeks equity has done equity, and that it comes into a court of equity with clean hands.

33 Am.Jur.Liens § 18 states:

"An equitable lien is a right, not recognized at law to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts. * * * Such a lien may be created by an express contract which shows an intention to charge some particular property with a debt or obligation *which may arise by implication from the relations and dealings of the parties whose interest are involved.* * * In part, if a transaction resolved itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is in equity a lien."

The United States at all times was fully acquainted with each step however minute, that took place from the very inception of the dealings herein, down to and including the absolute completion of the project. One of its representatives was based in the area, made daily inspections, and followed the complete stages of construction,—informing his superior in Richmond of all matters that transpired, as well as notifying those officials who were working in conjunction on this project of the steps in progress.

Incidentally on some several occasions changes were suggested by Capper and on being studied, were agreed to in many instances by plaintiff and effected at no additional cost. When progress payments were delayed plaintiff was often informed on inquiry that such delay was only temporary, and thereupon plaintiff seemingly was lulled to sleep to the extent that it, in furtherance of its contract, and obedient thereto, continued with the completion of said work without any notice whatever that there were questionable relations existing between Von Cannon and the trustees in the first and second deeds of trust, and not until the work had been completed and plaintiff fully entitled to payment therefor was it then informed that the payments due would not be forthcoming and that its recovery if at all, would come through the processes of the law.

It is not unusual to find that an equitable lien is often used to protect one who seeks payment for labor performed and materials furnished in good faith, and to provide justice and do equity. Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Town of River Junction v. Maryland Casualty Co., 5 Cir., 110 F.2d 278, 134 A.L.R. 727, cert. den. 310 U.S. 634, 60 S.Ct. 1077, 84 L.Ed. 1404.

I conclude therefore that plaintiff has fully complied with all the terms and conditions of the contract; that the funds therefore still in the hands of the United States and First Union National Bank are those to which plaintiff has the right to seek a recovery. That plaintiff has an equitable lien thereon and should have awarded to it, jointly and severally, a recovery against the United States and the First Union National Bank·in the

sum of $61,780.01, and an additional recovery against the United States in the amount of $193,135.27, a total amount of $254,915.28 against the defendants.

It is therefore ordered and adjudged that plaintiff have and recover judgment in the sum of $254,915.28, jointly and severally against the defendants Robert Leatherwood, III, Receiver for Paul Von Cannon, Inc., First Union National Bank, and the United States of America, and that such judgment be and it is hereby adjudged a lien upon the property described in the complaint and on the cash proceeds received from the sale to Drexel Enterprises, Inc., together with the costs of this action.

Counsel will submit decree.