F. W. EVERSLEY & CO., INC., on behalf of itself and all other persons entitled to share in funds allocated for the improvement of real property owned by the East New York Non-Profit HDFC, Inc., Plaintiffs,

v.

The EAST NEW YORK NON-PROFIT HDFC, INC., et al., Defendants.

F. W. EVERSLEY & CO., INC., on behalf of itself and all other persons entitled to share in funds allocated for the improvement of real property owned by Brownsville Housing Development Fund Corporation, Plaintiffs,

v.

BROWNSVILLE HOUSING DEVELOPMENT FUND CORPORATION et al., Defendants.

Nos. 75 Civ. 84 (HFW) and 75 Civ. 85 (HFW).

United States District Court, S. D. New York.

Feb. 4, 1976.

792

Demov, Morris, Levin & Shein, New York City, for plaintiffs; Kenneth M. Block, New York City, of counsel.

Thomas J. Cahill, Acting U. S. Atty., New York City, for defendant Carla Hills, Secretary of the United States Dept. of Housing & Urban Development; Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel.

Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for defendant Manufacturers Hanover Trust Co.; Samuel R. Rudey, New York City, of counsel.

St. John & Dougherty, Port Washington, N. Y., for defendant East New York Sav. Bank; Thomas P. Dougherty, Port Washington, N. Y., of counsel.

## OPINION

WERKER, District Judge.

These are two related causes of action for amounts due to a general contractor under construction contracts for the construction of two low-income housing developments. For convenience, 75 Civ. 84 will be referred to as *East New York*, and 75 Civ. 85 will be referred to as *Brownsville.*

Plaintiff has moved for summary judgment in each case under the Federal Rules of Civil Procedure, Rule 56. The Secretary of Housing and Urban Development, now Carla Hills, (the "Secretary" or the "government") has cross-moved for summary judgment. The East New York Savings Bank ("ENYSB") has asserted a cross-claim against the Secretary and cross-moves for summary judgment. Manufacturers Hanover Trust Co. ("Manufacturers") opposes plaintiff's motion and seeks summary judgment in its favor in its response papers although no formal notice of motion to that effect was ever filed. Neither housing development fund corporation has appeared in the action.

This action was removed from state court to this court under 28 U.S.C. § 1442(a)(1) (1970).[1] The complaints in both these actions seek damages from the Secretary on account of action he has or may take in his official capacity. In *East New York* injunctive relief is sought against the Secretary. *Haggard v. Lancaster*, 320 F.Supp. 1252 (N.D.Miss.

1970); *514 Citizens and Taxpayers of the Town of Epping v. Fecteau*, 269 F.Supp. 769 (D.N.H.1966); *Sarner v. Mason*, 128 F.Supp. 165 (D.N.J.1955).

The two non-profit organizations, Brownsville Housing Development & Fund Corporation ("Brownsville") and The East New York Non-Profit HDFC, Inc. ("East New York") entered into building loan agreements with Manufacturers and ENYSB, respectively. These loans were to provide mortgage funds for the construction of low-income housing projects. The Secretary, acting through the Commissioner of the Federal Housing Administration, agreed to insure the building loan agreements under section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (Supp. IV, 1975), *amending* 12 U.S.C. § 1715z–1 (1970). In *Brownsville*, Manufacturers agreed to loan Brownsville $10,096,000.00 to be advanced in stages during construction. Of that amount, $7,697,266.00 was to be made available for the improvement of property. In *East New York*, the ENYSB agreed to loan East New York $3,626,400.00, to be advanced in stages, $2,829,087.00 of which was to be for improvement of the property. Building Loan Agreement, Exhibit B.

F. W. Eversley & Co., Inc. ("Eversley"), a black construction company, executed a contract with Brownsville in one instance and with East New York in the other, for the general and off-site construction of each project. In *East New York*, the owner agreed to pay plaintiff the actual costs of construction plus a fee of $118,755.00 up to a maximum of $2,829,087.00. Change orders amounting to $12,067.00 were approved as being covered by the mortgage.[2] In connec-

---

1. This statute provides in pertinent part:

   "(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

   (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office . . ."

2. A provision in the printed form of the change orders states as a condition of acceptance that:

   "1. When the FHA estimated cost of all accepted changes results in a net decrease in the total construction cost the insurable mortgage will be similarly decreased, but *if the net effect is an increase the additional costs will be defrayed by the mortgagor.* The acceptance of any change or changes

tion with off-site construction, East New York deposited $23,400.00 with the bank to be held in escrow, pending plaintiff's performance of the work. On or about March 15, 1972, upon the bank's demand, Eversley deposited $7,500.00 with the bank to be held as collateral against East New York's open real estate taxes. In addition, the owner apparently escrowed an additional $18,824.00 to cover various sums due the bank which has already been expended.

In *Brownsville*, Brownsville agreed to pay plaintiff the cost of construction plus a fee of $284,521.00 up to an amount of $7,697,226.00 except as increased or decreased by approved changes. A change order of $100,050.00 was agreed to at the time of execution of the construction contract because of changes required by the New York City Building Department. Construction Contract, Rider A; Addendum to Closing Drawings and Specifications. Eversley also alleges that changes costing $29,359.20 were also required and approved by Brownsville and the Secretary. However, the documents submitted by the Secretary consisting of copies of all the change orders approved by HUD indicate that only changes in the amount of

$110,297.00 were approved, and nothing is submitted by plaintiff to controvert this.

In each case, the cost of improvement was to be paid totally by advances under the building loan agreement and neither owner was required to make any financial investment in the developments. Monies were advanced in each case by the Banks to the owners and progress payments were then made to plaintiff pursuant to the building loan agreements.

In each case, plaintiff has completed all work required by the construction contracts and related documents.[3] In each case, the owners are in default of their obligations under the building loan agreements and in their obligations to Eversley. In *East New York*, where the mortgage has been assigned to the Secretary, the government has declined to make further advances of additional monies under the building loan agreement. In *Brownsville*, where the mortgage has not been assigned, Manufacturers refuses to make any more advances under the building loan agreement.

Subsequent to the submission of the motion papers in this case, the plaintiff filed a voluntary petition in bankruptcy.

involving a net increase does not increase the mortgage amount." (emphasis added). However, in the Request for Construction Changes, actually approved by the Secretary and submitted as Exhibit 1 in the Secretary's Notice of Motion in *East New York*, handprinting between the printed lines indicates that changes in the amount of $12,067.00 plus $5,732.00 were approved by the Federal Housing Administration, as being covered by the mortgage.

**3.** In *East New York*, FHA Form 2485, Permission to Occupy was executed,* and Temporary

* Eversley has submitted FHA Form 2485 indicating that it executed this form on October 28, 1972 and not showing any signature by the government. The Secretary, however, has submitted a second FHA Form 2485 also executed by Eversley but on March 7, 1974 and signed by the government on March 12, 1974.

Certificates of Occupancy were issued November 15 and 17, 1972, although there is no indication that a permanent certificate was issued. In any event, however, the project was substantially occupied as of March 1, 1974. The

completion date was adjusted from April 1, 1972 to November 17, 1972 by approved change orders. Eversley executed its certification of actual costs to East New York on or about February 12, 1973. In *Brownsville*, Form 2485 was executed in several separate submissions. As to the East Building, one was executed by Eversley on August 9, 1972 and by the FHA on December 4, 1972. As to the West Building, one was executed by Eversley on January 26, 1973 and by the government on June 13, 1973, and as to certain floors of the West Building, the form was signed by plaintiff on June 8, 1973 and by the government on August 10, 1973. A Temporary Certificate of Occupancy was issued for the West Building on January 18, 1973. As to the East Building, a Temporary Certificate of Occupancy was issued on August 25, 1972. Eversley signed its certification of actual costs on or about February 12, 1973. Completion was required under the construction contract by November 18, 1972, but this was amended to add an additional three months on account of strikes. Permanent Certificates of Occupancy were executed on October 4, 1974.

In *Brownsville*, plaintiff claims an amount due it of $461,807.00 on account of retained percentages under the general construction contract and a balance due for approved change orders of $129,409.20 for a total of $591,216.20, plus interest from February 18, 1973. In *East New York*, the plaintiff seeks damages in the amount of $219,938.00, plus interest from December 17, 1972. This sum represents holdbacks in the amount of $176,971.00,[4] escrow deposits on account of off-site construction in the amount of $23,400.00, approved change orders in the amount of $12,067.00, and a tax escrow in the amount of $7,500.00.

In its first cause of action in each case, plaintiff alleges that a fund for the payment of its claim exists, that each fund constitutes a trust fund under the New York State Lien Law and that the plaintiff is a third-party beneficiary of these funds. In Eversley's second cause of action in *Brownsville* and third cause of action in *East ;New York*, it asserts that it and its subcontractors are statutory beneficiaries of funds consisting of retained percentages and escrow deposits under § 77 of the New York State Lien Law (McKinneys 1966). In the second cause of action in *East New York*, Eversley seeks to prevent the ENYSB from assigning its rights under the mortgage to the Secretary (although this issue is now moot, the assignment having already taken place) and to prevent the Secretary from thereafter foreclosing on the mortgage.

By way of defense, the government alleges that under the terms of the building loan agreements between the owners and the banks, that the banks were not obligated to make advances if the owners defaulted and that the Secretary was not obliged to approve further advances of loan proceeds under these circumstances. The government also asserts that the complaint fails to state a claim upon which relief may be granted.

The Secretary cross-claims against the owners in the event that the Secretary is held liable to the plaintiff in either action.

The government had previously been given leave to amend its answer to assert the defense that plaintiff's lien law cause of action was time-barred. Aside from the statute of limitations defense, the ENYSB also asserts as a defense that liens existed against the premises which would have had priority over the Bank's advances under the loan agreement and that where the loan agreement provided that the bank need not make any advances unless they constituted a first lien on the premises, that the bank was not obliged to make additional advances. ENYSB in its amended answer also cross-claims for judgment over against the Secretary in the event that plaintiff recovers against ENYSB. Manufacturers, aside from asserting the time bar in its amended answer, alleges that the complaint fails to state a claim upon which relief may be granted, that the bank made all advances which were approved by the Federal Housing Commissioner, and finally that the bank was to advance funds to the borrower under the building loan agreement only so long as the loan remained in balance and the borrower was not in default, and that it was not therefore required to advance any additional funds.

The parties agree that there are no genuine issues of material fact.

■ We hold as a matter of law that plaintiff is entitled to recover the value of the services it has rendered. The government in *East New York* and Manufacturers in *Brownsville*, each of which has acquired fully completed housing projects at a cost less than their actual value, have been unjustly enriched at the plaintiff's expense. *American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc.*, 407 F.Supp. 164, Civ. No.

---

4. Eversley had satisfactorily completed work valued at $2,800,796.00 but holdbacks reduced to 5% upon 95% completion of the work amounted to $176,971.00. ENYSB submits that $36,931.00 of this amount is actually for payments due under the contract rather than holdbacks.

576/1973 (D.V.I., filed November 26, 1975).

Subparagraph (a) of § 236 of the National Housing Act states that:

"For the purpose of reducing rentals for lower income families, the Secretary is authorized to make, and to contract to make, periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families, which shall be accomplished through payments to mortgagees holding mortgages meeting the special requirements specified in this section."

The purpose of the 1968 amendments to the National Housing Act was to add to the production of housing for low and moderate income families. House Banking and Currency Committee, Housing and Urban Development Act of 1968, H.R.Rep.No.1585, 90th Cong., 2d Sess. (1968) ("House Report"), U.S.Code Cong. & Admin.News 1968, p. 2873. Assistance under the § 236 program takes the form of periodic payments to the mortgagee on behalf of the mortgagor which reduces interest costs on the mortgage.[5] The mortgagor makes monthly payments for principal and interest as if the mortgage bore an interest rate of one percent, while the federal government pays the difference between the market interest rate and the 1% rate to the mortgagee. FHA mortgage insurance is also part of the § 236 program.

Under the insurance aspects of the § 236 program, the construction lender is protected against all risks of default. The lender may immediately claim from FHA under the mortgage insurance contract if the mortgagor defaults. The lender has the option of either foreclosing or assigning the mortgage to HUD.

The Commissioner of the Federal Housing Administration, acting on behalf of the Secretary, maintained control over the payment of advances to the owners and ultimately over final payment to the contractor. The borrower in each instance was entitled only to such amount "as may be approved by the Lender and the Commissioner," Building Loan Agreement, paragraph (4)(a), and the banks were to continue to advance funds to the borrowers only so long as the loans remained in balance and the borrowers were not in default. Under the terms of the building loan agreement in each instance, the banks were authorized to withhold holdbacks in the amount of ten percent. Applications for advances were to be for amounts equal to:

"(i) the total value of classes of the work acceptably completed; plus (ii) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the ·site; less (iii) *10 percent (holdback)* and less prior advances." Building Loan Agreement, paragraph (4)(a) (emphasis added).

The balance due the borrower was to be payable "at such time after completion as the commissioner authorizes the release of the holdback." Building Loan Agreement, paragraph (4)(b).

The involvement of the Department of Housing and Urban Development in the arrangement in each case illustrates the extent to which the government controlled the financial arrangements and took responsibility for the execution of the projects. FHA prepared Project Income Analyses and Appraisals with respect to the projects. The Commitment for Insurance of Advances, setting forth the terms of the insurance endorsement by HUD of the mortgages provided that both the building loan agreement and the construction contract in each case were to be executed on forms provided by HUD. Commitment form, paragraph 3. The mortgages, in addition, were executed on an FHA form. As indicated above, the approval by HUD of final completion was required in order for the contractor to be paid. These are but a few of the examples of the complete control exercised by the Secretary.

As the plaintiff aptly puts it, the owners, non-profit, no-asset corporations,

---

**5.** 1968 U.S.Code Cong. and Adm.News at pp. 2874, 2877.

were the "creatures of HUD." Plaintiff's Reply Brief at 12. The sponsor-mortgagors of the projects here were individual representatives of minority religious and community groups with no assets. Even seed money was obtained by them from outside sources. In *Brownsville*, for example, seed money was contributed by New York City and New York State. Plaintiff's Exhibit D, p. 2. The owners were eligible for loans in the amount of the total cost of development. The plaintiff has in good faith completed the construction in accordance with the requirements of the construction contracts. The banks were fully insured in the event of a default by the owners. The government had the remedy of foreclosure available to it in the event of default. *Cf. Federal National Mortgage Assn. v. Ricks*, 83 Misc.2d 814, 372 N.Y. S.2d 485, 44 U.S.L.W. 2143 (Sup.Ct. Kings County, Sept. 15, 1975). The only party lacking protection against default was the plaintiff. The mortgage note executed in *East New York* contains the following typed-in provision:

"Notwithstanding any provision contained herein, Mortgagee shall not seek any personal judgments or deficiencies against the maker of this Note or any principal or partner thereof and will look solely to the mortgaged premises as security for the loan being made pursuant to the Loan Agreement and evidenced by this Note."

The last-mentioned provision is further recognition of the fact that the parties never really looked to the borrower as the ultimate source of security for the loan.

Plaintiff had been led to expect that HUD would make good any sums rightfully due the contractor in construction projects involving non-profit organizations. Eversley had participated in various other such construction projects. In previous contracts with non-profit organizations, the government had made it a practice of increasing the mortgage insurance and consenting to a similar change in the building loan agreement when it came time for a final closing.

Thus, by following such practices HUD induced Eversley and other minority group contractors to participate in the construction program. Only with the advance of inflation did HUD begin to change its policies and to assert those defenses it claims here to the detriment of those like plaintiff who had justifiably relied on the government's previous practice. In a hearing in a related case, *F. W. Eversley & Co., Inc. v. Gates Avenue Block 1634 H.D.F.C., Inc.*, 74 Civ. 4475 (S.D.N.Y., filed Sept. 11, 1974), Mr. Frederick W. Eversley, Jr. testified that he had received from the area director and secretary of HUD a "pretty firm verbal contract a minority contractor doing community work that HUD was" going to "make everyone whole." Transcript at 218. Mr. Eversley further testified:

"In this case they changed their whole concept since you got into the period of inflation and suddenly everybody is pulling the purse strings. But I think it is wrong to hurt a contract and the community by changing a policy when you enter into a contract in 1971 and 1973 and 1974, you say, you know . . .

"The language is the same for the for profit jobs as they are for the non-profit jobs and we were told that they were not going to change the forms, that they had to follow their procedures, but they would—because they had other procedures that if we would go along with this that at the time of filing the job out, they would recapitalize the mortgage or increase it to pay what was needed to be paid to get it done." Transcript at 219.

■ It is significant that although both the banks and HUD and the mortgagors knew that the mortgagors were non-profit organizations with little or no assets they used forms of building loan agreement which were designed to be used by profit making corporations. They consequently each participated in what may be said to be a cosmetic fraud upon the builder who, upon the strength of those documents would have in the

normal course recourse against a profit making corporation. A court of equity has the power to pierce and surmount the obvious fabrications which were thus created by the government and the banks.

The defendants all assert that the owners were in default and that therefore the banks were not required to advance any additional money under the building loan agreement. While this defense would apply in the ordinary situation, here, however, where the owner was never an entity with funds and the government and banks knew this at the time of the execution of the agreements, it is unreasonable to permit the government and banks to rely on such a defense. The owners, since they were without assets, were in actuality created and permitted to enter into the agreements for the convenience of the government in effectuating the § 236 program.

■ In *Brownsville*, the Secretary claims a disallowance for items of AMPO disbursement in the amount of $245,-620.76. These sums of money were allegedly improperly expended by the owners. AMPO deposits were required so that cash would be available in the event that cash required by the contract documents exceeded the amount estimated by the FHA. This claim is subject to the same infirmities as is the government's argument as to the default by the owners. The owner has no resources with which to pay FHA these funds and the government knew this when it undertook the project to begin with. Thus, plaintiff should be paid the amount due it in spite of any disallowance for which the owner may have been accountable.

■ Through 12 U.S.C. § 1715z–3(a)(2) (1970), the provisions of 12 U.S.C. § 1713(g)(1970) apply to section 236 projects. Under the latter provision, once default has occurred and the mortgage has been assigned, any balance of the mortgage loan not advanced by the mortgagee is assigned to the Secretary along with any property held by the mortgagee as deposits made for the account of the mortgagor. Thus, in *East*

*New York*, the government is now in possession of any funds to which Eversley is now entitled including the $23,-400.00 escrow deposit on account of off-site construction in light of the fact that the mortgage was assigned on November 25, 1974. We therefore hold that since the ENYSB has assigned the mortgage to the government, it is no longer liable under the building loan agreement. We grant summary judgment in favor of the ENYSB. *Travelers Indemnity Co. v. First National State Bank of New Jersey*, 328 F.Supp. 208 (D.N.J.1971).

We do not find it inequitable to hold the government and Manufacturers liable to a party with whom each has not specifically contracted. *Travelers Indemnity Co. v. First National State Bank of New Jersey, supra; Sears, Roebuck & Co. v. Jardel Co., Inc.*, 421 F.2d 1048 (3d Cir. 1970); *County of Giles v. First U.S. Corp.*, 223 Tenn. 345, 445 S.W.2d 157 (Tenn.1969); *Flintkote Co. v. Brewer Co. of Florida, Inc.*, 221 So.2d 784 (Fla.Ct.App.1969), *cert. denied*, 225 So.2d 920 (Fla.1969); *Thomas G. Snavely Co. v. Brown Construction Co.*, 16 Ohio Misc. 50, 45 Ohio Op.2d 41, 239 N.E.2d 759 (C.P.1968); Comment, *Contracts for the Benefit of Third Parties in the Construction Industry*, 40 Fordham L.Rev. 315 (1971). To the extent that this opinion is inconsistent with *Trans-Bay Engineers & Builders, Inc. v. Lynn*, 396 F.Supp. 265, Civ. No. 74–1619 (D.D.C., filed May 20, 1975), we decline to follow that case. It is clear that the National Housing Act was meant to benefit more than just mortgagees. *Cf. Caramico v. Secretary of the Department of Housing and Urban Development*, 509 F.2d 694, 700–701 (2d Cir. 1974). As part of the 1968 amendments to the Act, for example, provision was made for the Secretary of HUD to require that opportunities for employment arising in connection with the construction or rehabilitation of housing be given to lower income persons residing in the area of such housing in order to provide jobs as well as housing for these people. House Report, *supra*, U.S.Code Cong. and Adm.

News at p. 2877. Congress intended the National Housing Act to be effectuated in part through the participation of private enterprise in the financing and production of housing. This intent was carried over in 1968 amendments to the Act.[6]

■■■■ The escrow funds and retainages constitute an identifiable *res* held by the government and Manufacturers, upon which an equitable lien may be placed. *American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc.,* 407 F.Supp. 164, Civ. No. 576/1973 (D.V.I., filed Nov. 26, 1975). Upon the making of each payment of the building loan proceeds it was required that the HUD approve the payment after inspection. Thus HUD certified that the full amount of the progress installment was due. The amount held back was held for two reasons: first, to stimulate completion of the construction according to the timetable, and second, to insure that a fund would be available to complete the project if the contractor defaulted in part. Thus an identifiable fund was created.

As in *American Fidelity*, the funds were ultimately designated for payment to the general contractor for completion of the project under the construction contract. As that court stated:

"The legal obligations are not set aside; they are *surmounted* and transcended by equitable considerations." *American Fidelity, supra,* at 184 (emphasis in the original).

Furthermore, as the court in *G. L. Wilson Building Co. v. Leatherwood,* 268 F.Supp. 609 (W.D.N.C.1967) declared:

"[N]o identic form or phraseology is necessary to create an equitable lien for . . . a court of equity always looks through the form to the substance of the transaction, and it would appear beyond question that the facts and circumstances of this case represent an area where equity should act under the doctrine of an equitable lien, thereby recognizing the right of plaintiff to have the specific funds herein applied to the obligations that arise from the work done and materials furnished." *Id.* at 621.[7]

6. 1968 U.S.Code Cong. and Adm.News, *supra* at p. 2894.

7. The government makes the argument that the insurance provisions of the National Housing Act and the agreements entered into pursuant thereto are for the sole protection of the government, citing *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) and *United States v. Emory,* 314 U.S. 423, 62 S.Ct. 317, 86 L.Ed. 315 (1941). Each of these cases is distinguishable from the present case. In *United States v. Neustadt,* the Supreme Court held that the government was not liable under the Federal Tort Claims Act for damages to a purchaser who relied on an inaccurate appraisal by the FHA in purchasing a house. The Court indicated that the purpose of the appraisal system was solely for the protection of the government's insurance funds and that the government had no specific duty to purchasers to make accurate appraisals. We note, however, that this decision was rendered in the narrow context of appraisals by the FHA and that the suit sounded in tort. Different policy considerations are at work in the context of the present case which is basically an equitable claim. In *United States v. Emory, supra,* the Court held that nothing in the National Housing Act changed the result that the United States as assignee of a note insured under the National Housing Act had

priority over the claims of wage earners under the predecessor statute to 31 U.S.C. § 191 (1970).* However, the reasoning in *Emory* is

* This statute provides:
"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

inapplicable because the purpose of the statute under consideration in that case was the protection of the public revenue whereas the purpose of § 236 of the National Housing Act is not to produce revenue but to provide housing for low and middle income individuals. Although this argument was made in Justice Reed's dissent in *Emory*, and presumably rejected by the majority, it was made as to Title 1 of the National Housing Act, whose purpose is different from that of the § 236 program.

It is unfortunate, if true, that the government will lose money upon foreclosure of these properties. But that in no way touches plaintiff's claim of unjust enrichment. That claim cannot be destroyed by the aberrations of the market or the national economy. It speaks as of the date of completion of the project, not the date of foreclosure sale.

Construction was complete in *Brownsville* when Permanent Certificates of Occupancy were issued, *i. e.*, October 4, 1974. Under the terms of the construction contract, Eversley was entitled to payment 30 days thereafter and is thus entitled to interest computed from November 4, 1974. Construction Contract, Article 3, paragraph C. In *East New York*, where no Permanent Certificate of Occupancy was apparently issued, April 16, 1973, the date on which the Certificate of Substantial Completion certifying that the project could be occupied is the relevant date for completion.[8] Thus, plaintiff is entitled to interest from 30 days after April 16, 1973, *i. e.*, May 16, 1973. The damages to which Eversley is entitled in *East New York* are to be reduced by the sum of $12,271.05, the costs found by the auditors to be improper or unsupported. The amount claimed by Eversley in *Brownsville* must be reduced by $19,112.20 due to the fact that changes claimed by Eversley to the extent of this sum are not documented.

For the reasons stated above, summary judgment is granted in favor of Eversley against the Secretary in *East New York* and against Manufacturers in *Brownsville*.

Submit Order on Notice.

While Title 1 was intended to stimulate recovery and employment in the construction industry and to enable property-owners to obtain repairs, the purpose of § 236 was to insure decent housing for low and moderate income families, clearly a non-monetary purpose.

8. Although in the Affidavit of Ralph Lapadula in support of the government's motion Mr. Lapadula claims that this Certificate was submitted by Eversley as late as February 26, 1974, no documentary proof in support of this contention is submitted.