MURSOR BUILDERS, INC., Plaintiff

v.

CROWN MOUNTAIN APARTMENT ASSOCIATES; THE SECOND COLUMBUS CORPORATION; AMERICAN MOTOR INNS, INC.; ROGER F. MORAN; EVELYN J. MORAN; IRVIN RUBIN; THE LEADER MORTGAGE COMPANY; and PATRICIA ROBERTS HARRIS, Secretary of Housing and Urban Development, Defendants

Civil No. 74/731

THE SECOND COLUMBUS CORPORATION, Plaintiff

v.

IRVIN RUBIN; ROGER F. MORAN; and EVELYN J. MORAN, Defendants

Civil No. 75/67

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 5, 1978

---

55

MARIA A. TANKENSON HODGE, ESQ., St. Thomas, V.I., *for Mursor Builders, Inc.*

RONALD T. MITCHELL, ESQ. (PALLME, ANDUZE, MITCHELL & DOW), St. Thomas, V.I., *for the Leader Mortgage Company*

GERALD K. CARLISLE, ESQ. (CARLISLE, REIMER, BIRGE & MORRISON), Cleveland, Ohio, *for the Leader Mortgage Company*

MICHAEL LEHTONEN, ESQ., St. Thomas, V.I., *for Roger F. Moran*

SAMUEL H. HALL, JR., ESQ., St. Thomas, V.I., *for Irvin Rubin*

ELIZABETH LANGER, ESQ., THOMAS K. MOORE, ESQ., St. Thomas, V.I., for *Patricia Roberts Harris, Secretary of Housing and Urban Development*

59

YOUNG, *District Judge*

# I. INTRODUCTION

The legal and factual issues presented by this lawsuit are multiple. Nevertheless, one such issue and the policy considerations underlying my disposition thereof warrant particular mention at the outset.

In an effort to stimulate the development of multidwelling housing complexes, the federal government offers mortgage insurance to private financing of multiple housing building construction. As an added inducement, the government covenants to accept assignment at relatively financially attractive terms of any such mortgage loan in the event of default. An unfortunate by-product of this federal program is the making of financing available to individuals who, were it not for the protective aegis of the federal loan insurance, would be deemed poor financial risks. The government, recognizing the inevitability of this unfortunate by-product, imposes stringent disclosure requirements upon the borrower, the lender and the building contractor. Notwithstanding these strict requirements, full disclosure is not always made, the project sponsor (and borrower) often defaults on its loan repayment obligations and the lender, in order to be "bailed out," usually assigns its interest under the building loan agreement to the government. And often after the assignment there remains undisbursed mortgage loan proceeds and monies due the building contractor for work performed. Said scenario reflects the factual development giving rise to this litigation.

■ In recent years contractors have successfully contended that, as third-party beneficiaries of the building loan agreement between the sponsor and lender, they are

entitled to recover from the undisbursed mortgage loan proceeds assigned to the federal government the amounts due them under the construction contract. Indeed, this Court constituted the forum of one of the earliest of such successes. American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc., 12 V.I. 325, 407 F.Supp. 164 (D.V.I. 1975). However, based upon the entire factual picture painted by this lawsuit, the Court cannot countenance recovery by plaintiff from the government under said legal theory. The decision of the *Court* is a function, inter alia, of two overriding considerations. First, the government's participation in the development of the subject housing project was induced in large measure by numerous material factual misrepresentations made by or chargeable to the contractor. Second, the project sponsor, despite having defaulted under the building loan agreement, remains an economically viable entity and thereby represents an adequate source of recovery for plaintiff. The Court is of the opinion that under such circumstances plaintiff cannot obtain legal redress from the public purse, but rather must look to the parties with whom it directly contracted for any recovery it might have.

## II. FINDINGS OF FACT

In 1970 Irvin Rubin ("Rubin") and Roger F. Moran ("Moran"), experienced local realtors, agreed to develop an apartment complex on Plot Number two, Estate Contant, St. Thomas. Formulation of the initial plans encompassed nearly six months and spawned the organization of The Second Columbus Corporation ("Second Columbus") with Rubin as corporate president, Moran as vice-president and each of said individuals as fifty percent (50%) shareholders. The sole asset of the corporation was the aforedescribed unimproved realty, then encumbered by a ninety-

five thousand dollar ($95,000.) purchase money mortgage lien.

Among those who initially discussed the proposed development, officially named, "Crown Mountain Apartments" but commonly referred to as "The Towers", were Frank J. Murphy, president of Mursor Builders, Inc. ("Mursor Builders"), a Pennsylvania construction corporation, and Kim Kelsick of The Leader Mortgage Company ("Leader"), a private mortgage lender with its principal offices in Ohio. At a relatively early stage in the discussions it became the express agreement of the parties to utilize federal mortgage insurance made available by the Federal Housing Authority ("FHA"), an organizational unit of the Department of Housing and Urban Development ("HUD"), pursuant to § 207 of the National Housing Act, 12 U.S.C., § 1701, et seq. Murphy advised the parties that it would be necessary to secure an FHA insurance commitment which would permit the allocation of $2,316,-000. for construction costs.

On November 24, 1970, Rubin and Moran, through the offices of Second Columbus, and Leader submitted an FHA form 2013 application for project mortgage insurance. Project costs were represented at $2,622,000. with $2,316,-000. thereof attributable to costs of construction. Additionally, the applicants represented to FHA that the Towers project would be accorded one hundred percent (100%) real estate tax exempt status by the local government. Following a federal project feasibility study FHA advised the applicants that the economics of their proposal supported a maximum project cost of $2,607,578., that FHA would insure $2,346,800. thereof, and that of said insurable amount $1,889,806. could be allotted for costs of construction. The sponsors were further advised that, contingent upon substantiation of their purported tax exemption benefits, they would be required to effect an equity invest-

ment of $143,364. The sponsors were invited by FHA to submit an application for a conditional commitment for project mortgage insurance in accordance with the above-described FHA feasibility determinations.

At the urging of Leader, FHA subsequently amended its feasibility determinations to increase maximum project cost to $2,722,222., the insurable portion thereof to $2,454,-000., and the construction budget to $2,003,850. FHA also advised the applicants that, having failed to substantiate their claimed tax exempt status, they would be required to contribute an equity investment of $353,418., an increase of $210,054. from the initial feasibility determination.

It was the desire of Rubin and Moran to effect the development of the Towers with a minimum of personal cash expenditure and investment. The FHA study left them short of funds in three principal areas: (1) there remained an unsatisfied mortgage indebtedness of $95,000. on the subject property; (2) FHA required an equity investment from the sponsors which exceeded by approximately $210,-000. the financial resources available to them; and (3) costs of construction exceeded by $312,150. the construction budget permitted by FHA. As to the latter deficiency, Leader suggested the possibility of reallocating the funds available on various FHA form 2013 budget line items. Moran was amenable to said proposal.[1] However, Murphy questioned the parties' ability to reallocate line items without FHA approval.

On March 8, 1971, Murphy wrote to Rubin regarding the FHA feasibility determinations. Murphy noted that despite FHA's allocation of $2,003,850. for construction costs, total construction cost allowances under the feasibility let-

---

[1] It appears from the evidence that as early as February 25, 1971, the parties contemplated some involvement by American Motor Inns, Inc. in the development of the Towers. See, e.g., Pl. Exh. 99, letter from Moran to Murphy dated February 25, 1971.

ter equalled $2,135,121.[2] Murphy noted that the difference of $180,879. could be satisfied through a supplementary agreement between the contractor and sponsors. Murphy suggested several possibilities: that the sponsors make a cash payment of said amount to Mursor Builders; that the sponsors extend a second priority mortgage on the subject realty to Mursor Builders; that Mursor Builders take an equity position in Second Columbus; or that some combination of the aforesaid proposals be effected. Murphy, aware of FHA restrictions on the financial relationship of a contractor and project sponsors, closed his letter with the caveat that any outside agreement should not be such as to create an "identity of interest" or otherwise destroy the arm's length nature of the parties' business dealings. A copy of the aforesaid correspondence was transmitted to Kelsick at Leader.

During the ensuing months various proposals were exchanged by Second Columbus and Mursor Builders as to how to satisfy the construction cost deficiency, and Leader was advised at various times that said problem would be solved by Mursor Builders and the project sponsors.

In April of 1971 Rubin and Moran, in their personal capacities and on behalf of Second Columbus, formed a limited partnership under the name Crown Mountain

---

[2] Murphy reached said figure by totalling the following FHA budget allowances: $2,003,850. for costs of construction, $80,900. for design architectural services, $42,085. for supervisory architectural services, and $8,286. for construction bond premiums. See, Pl. Exh. 100, letter from Murphy to Rubin dated March 8, 1971. From said correspondence it would appear that Murphy had compromised his demand to be paid $2,316,000. for construction, over and above the $80,900. charged for design architecture services performed by Harold Frederick, Jr. on behalf of Mursor Builders. As indicated infra, however, $80,900. was payed to Mursor Builders outside the construction contract, pursuant to an extraneous agreement between the contractor and sponsors. Mursor Builders was, in effect, paid twice for design architect services. It is also noted that Murphy's inclusion of the FHA budget allowance for *supervisory* architect services as an amount includable in total construction allowances payable to Mursor Builders indicates the close financial relationship between said architect and the contractor.

Apartment Associates ("Crown") which was to become the official sponsor of the Towers project. Second Columbus was designated as general partner, possessing a ten percent (10%) partnership interest. Rubin and Moran were the limited partners, each possessing a forty-five percent (45%) partnership share. The only asset of said partnership was the aforementioned unimproved realty which was still subject to the $95,000. purchase money mortgage lien. A limited partnership certificate was filed with the Recorder's Office for the District of St. Thomas and St. John on September 2, 1971.

On October 7, 1971, FHA transmitted to Leader an FHA form 2264-A—supplemental project analysis indicating a maximum insurable mortgage loan of $2,454,500. The construction cost budget remained $2,003,850. and the equity investment requirement imposed upon the sponsor remained $353,418. It appeared that the construction cost deficiency would be cured by a mutually satisfactory agreement between the sponsors and Mursor Builders. Time had become a crucial factor in the project, however, as an initial closing[3] date of December 20, 1971, had been established. In addition, Rubin and Moran had theretofore expended considerable sums of money in formulating the development plans. Failure to consummate the initial closing would translate into substantial personal financial losses. There remained unsolved the problems of the equity requirement deficiency and the unsatisfied mortgage lien on the subject realty. To cure said problems, Rubin and Moran turned to American Motor Inns, Inc. ("AMI"), a publicly-held Virginia based corporation, engaged in the

---

[3] Initial closing constitutes the date on which the construction contract, building loan agreements, and mortgage instrument in favor of lender are executed. Final closing, on the other hand, is not effected until construction has been fully completed. In the matter sub judice initial closing took place on December 20–21, 1971. Final closing has yet to be consummated.

construction and operation of Holiday Inn hotels and motels throughout the United States and its territories.

Moran communicated with AMI executives, Joel and Adolph Krisch, with whom he had had prior business dealings in St. Thomas, and a meeting was held in late November or early December of 1971 in the AMI corporate offices in Roanoke, Virginia. Present were Rubin and Moran, their counsel, Robert Preston, Joel and Adolph Krisch, respectively the president and chairman of the board of directors of AMI, and Benjamin Richardson, general counsel and senior vice president of AMI. Rubin and Moran represented that they had all but finalized a very straightforward construction project, needing only $210,000. cash to satisfy the FHA equity investment requirement. They advised AMI that the FHA approved loan amounts would satisfy all project costs and that all that was needed to consummate initial closing was the aforenoted equity. Rubin and Moran further represented that they would personally assume the obligation of freeing the subject realty of any outstanding liens prior to initial closing, and that AMI would not have to involve itself in any manner with the project during the period of construction, beyond effecting a $210,000. investment.

AMI was amenable to the proposal. In reliance upon Rubin and Moran's aforesaid representations, and in exchange for a one-half (1/2) interest in the Crown Limited partnership, it directed the Kanawba Bank in Charleston, West Virginia to issue a note payable to Rubin and Moran in the amount of $210,000. AMI guaranteed repayment of said note and assumed the obligation of making interest payments during the period of building construction. An amended limited partnership agreement was executed which provided that as of December 17, 1971,[4] the Crown

---

[4] See, Pl. Exh. 57, paragraphs 6B and 10.

partnership was comprised of AMI as a fifty percent (50%) general partner, Second Columbus as a ten percent (10%) managing general partner and Rubin and Moran, each as twenty percent (20%) limited partners. The agreement of the parties vested in Second Columbus all managerial duties subject, however, to a limitation upon its ability to incur any partnership debt in excess of $2,500. without the express consent of AMI. The agreement further constrained Second Columbus from assigning, selling, mortgaging or otherwise dispensing of any portion of its partnership interest or capital assets without the consent of AMI.

As noted above, the initial closing had been scheduled for December 20, 1971. The overriding concern of Rubin and Moran was to consummate said closing without delay. To advise FHA at said date that AMI had assumed a partnership interest would necessitate resubmission of all germane closing documents to reflect the same, thereby mandating at the very least indefinite postponement of the imminent initial closing. AMI was sympathetic with Rubin and Moran's express desire to withhold from FHA at initial closing any information as to AMI's interest in the Crown Limited partnership. The product of said mutual concern was the execution of an extraneous agreement contemporaneous with the execution of the amended limited partnership agreement.

Although said side agreement purported to delay AMI's "formal admission" into the Crown partnership until some nebulous future date, in actuality, the parties deemed AMI a partner as of December 17, 1971. The purpose of the side agreement was inter alia to provide Rubin and Moran with a colorable defense to any subsequent FHA charge of fraud for nondisclosure of AMI's partner-

ship interest at initial closing.[5] The agreement further provided that AMI be entitled to indemnification from Second Columbus, Rubin and Moran for any partnership liability it might incur above its $210,000. capital contribution, and that any mortgage note executed by Second Columbus at initial closing provide that it be without recourse against the personal assets of the Crown partners. Finally, the terms of said agreement required Second Columbus, Rubin and Moran to satisfy any outstanding liens on the subject realty prior to recordation of the building loan agreement and restricted the use of AMI's $210,000. contribution to that of equity capital in accordance with the terms of the FHA commitment to insure.

Upon receipt of the AMI funds Rubin and Moran utilized the same to satisfy the $95,000. mortgage lien on Plot Number 2 Estate Contant, to satisfy a personal financial obligation of $15,000. to FMT Government Corporation,[6]

---

[5] Faced with possible exposure to significant liability for the contractual obligations incurred by Crown on December 20, 1971, AMI understandably contends that it was not a member of the partnership on said date. Had the trial and deposition testimony of AMI principals reflected some consistency as to when, in fact, AMI deemed itself a partner, the Court would attach greater significance to the evidence of the parties' contractual intent. However, it has been urged that: (1) consummation of initial closing constituted the operative contingency for AMI's admission; (2) completion of construction marked the entrance date; (3) effectuation of final closing resulted in AMI's admission; and (4) recordation of an FHA mortgage caused AMI to become a partner. The language employed in the extraneous agreement is equally Delphic as to said issue. Moreover, the provisions in said agreement pertaining to indemnification of AMI by its partners for any liability it might incur as a Crown general partner are indicative of the parties' true intent at the time of execution of said agreement. See, Pl. Exh. 58, paragraphs 3, 4, 5, 7, and 11.

In its post trial brief AMI has abandoned the above-mentioned positions, contending rather that it became a partner on February 28, 1972, upon filing the certificate of limited partnership with the Virgin Islands government.

[6] The financial interests in FMT Government Corporation were held in equal shares by Murphy, one Ray Turner and Harold Frederick, Jr. who, as discussed infra, served as Mursor Builders' in-house design architect for the Towers as well as the supervising architect. FMT had effected a $15,000. loan to Rubin and Moran prior to initial closing.

to pay to themselves $10,000. apiece, and to cover a portion of the actual construction costs which exceeded the construction costs authorized by FHA. In regard to this latter item Rubin and Moran directed their attentions once again to Mursor Builders.

On December 20, 1971, Rubin and Moran, through their corporate offices, executed on behalf of Crown and Second Columbus a promissory note payable to Mursor Builders in the amount of $216,779., which sum constituted the difference between actual construction costs and the FHA budget allowance therefor. Of said note amount, the sum of $80,900. was payable on the day of initial closing. As noted above, said amount equalled Mursor Builders' fee for design architectural services and payment was made by Rubin and Moran from the AMI investment. The sum of $50,000. was payable at final closing, which event has yet to transpire. Interest on the balance of $130,879. commenced to accrue on the first day of the month following that month in which the Towers were made available for occupancy. Said balance was to be remitted in monthly installments of no less than $2,000. commencing on the date on which interest began to accrue.

By the terms of said promissory note Mursor Builders was afforded the right to accelerate repayment of the entire note amount, including interest thereon, in the event any of the repayments were not duly effected. The note was personally guaranteed by Moran, his wife, Evelyn J. Moran, and Rubin.

As further security, a pledge agreement was executed by Rubin and Moran, through their corporate offices, placing the shares of Second Columbus in escrow with instructions to deliver the same to Mursor Builders upon demand in the event of default by the borrowers on their repayment obligations. Recognizing that FHA regulations barred any identity of financial interest between building

contractor and project sponsor, the pledge agreement was drafted to afford Mursor Builders the right to utilize and enjoy Second Columbus shares *"as if* it were the owner thereof" (emphasis added).[7] The Second Columbus shares were endorsed by Rubin and Moran and deposited with an escrow agent, and Rubin and Moran executed undated resignations from their capacities as Second Columbus officers.

It was understood by the parties that the note and pledge agreement bound the Crown Limited partnership by its terms and that AMI had theretofore become a partner in Crown. It was further understood that AMI would not acquiesce to the execution of said documents. Accordingly, no disclosure thereof was made to AMI. Rather, Murphy required Rubin and Moran to execute affidavits wherein it was represented that AMI had full knowledge of the fact that excess monies were due Mursor Builders for actual construction costs and that AMI had knowledge of and had agreed to the terms of the promissory note and pledge agreement. It was further averred by Rubin and Moran that no terms set forth in the promissory note and pledge agreement contravened the terms of the limited partnership agreement between AMI, Second Columbus, and the affiants. Despite ample opportunity to do so, Murphy did not verify said averments with AMI principals.

Rubin, Moran, and Murphy had agreed upon Harold Frederick, Jr., as the supervising architect for the Towers project. It was understood by said parties that FHA regulations required the supervising architect to be free of any financial interest in the project and of any identity of

---

[7] See, Pl. Exh. 9B.

interest with the project sponsor or builder.[8] The parties were fully cognizant of Frederick's close ties with Mursor Builders, having served as the construction company's in-house design architect on this and other building projects. The parties were further aware that Frederick and Murphy were each one-third (1/3) owners of FMT Government Corporation, which entity had heretofore advanced to Rubin and Moran the sum of $15,000. in connection with the Towers project.

The parties were also aware that FHA regulations precluded any identity of interest between the project sponsors and building contractor.[9] Although the concept of identity of interest was of a somewhat nebulous nature, it was appreciated by the parties that the determination of the existence thereof was vested in the discretionary exercise of the government, and that such discretion could not properly be exercised without full disclosure by the contracting parties of any colorably material facts.[10]

The parties further understood that FHA regulations mandated disclosure of any contracts for building construction extraneous to the FHA form construction contract and of any financial obligations of the sponsors for building construction extraneous to the building-loan agreement.[11] They were aware that FHA would require disclosure of the promissory note between Mursor Build-

---

[8] See, HUD Exh. KKKK, Owner-Architect Agreement for Services in the Construction and Guarantee Period, FHA form 2719-C, paragraph 15; Pl. Exh. 6, Agreement and Certification, FHA form 3305, paragraph 10; Trial Test. of Jose E. Febres-Silva and Noel Pietri.

[9] See, Pl. Exh. 6, Agreement and Certification, FHA form 3305, paragraphs 5, 10; Pl. Exh. 100, letter from Murphy to Rubin dated March 8, 1971.

[10] See, Pl. Exh. 6, Agreement and Certification, FHA form 3305, paragraph 13; Pl. Exh. 1, Construction Contract—Lump Sum, FHA form 2442, article 7.

[11] See, HUD Exh. TT, Regulatory Agreement for Multi-Family Housing Projects, FHA form 2466, paragraphs 6(B), 15; Pl. Exh. 1, Construction Contract—Lump Sum, FHA form 2442, articles 1, 7, 9D; HUD Exh. AAA, Mortgagor's Certificate, FHA form 2433, paragraphs (3), (13); Pl. Exh. 6, Agreement and Certification, FHA form 3305, paragraph (5). See, also, Trial Test. of Leticia R. Fernandez.

ers and the project sponsors as well as the related pledge agreement, and that such agreements would be material to a government determination to involve itself as loan insurer for the Towers project.

Finally, the parties appreciated the necessity of disclosure of any identity of interest between either the project sponsors or the building contractor and the various building subcontractors who were to be employed during building construction.[12] They were aware that Desco Products Caribbean, Inc., of which Moran was a fifty percent (50%) owner, Fort Union Equipment, Sordoni Construction Company, and Turner Construction Company would be utilized as subcontractors and that the financial relationships between said subcontractors and the parties to the construction company would be the subject of federal disclosure requirements.

Initial closing was held in San Juan, Puerto Rico on December 20th and 21st of 1971. None of the above-mentioned information was disclosed to FHA officials by either Mursor Builders or the project sponsors. To the contrary, Mursor Builders certified its total construction costs to be $2,012,136., which represented the $2,003,850. permitted by FHA plus the $8,286. bond premium. See, Pl. Exh. 1, Contractor's Cost Breakdown, FHA Form No. 2328, lines 52, 53. Among the documents executed at said initial closing were the building loan agreement, Pl. Exh. 5, the construction contract, Pl. Exh. 1, and the owner-architect agreement, Pl. Exh. 7. As noted above, the promissory note and pledge agreement between Mursor Builders and Crown were executed of even date. Pl. Exhs. 9A, 9B. Finally, the mortgage note between Crown and Leader was also executed at initial closing, and, in accordance with the aforenoted demand by AMI, it contained the following proviso:

---

[12] See, Pl. Exh. 6, Agreement and Certification, FHA form No. 3305, paragraph (5).

72

The maker [Crown] assumes no personal liability for the payment hereof except as set out in the mortgage deed at even date given to secure this indebtedness.

Pl. Exh. 4, Mortgage Note, FHA Form No. 4165-D, page 2.

It appears from the documentary evidence that Crown was not required at initial closing to furnish the full amount of the equity investment required by the FHA in its project feasibility correspondence. For some unexplained reason the Mortgagee's Certificate was altered by hand to reduce the $209,328. cash requirement of the sponsors to $32,597.[13] It was apparently due to said reduction that Rubin and Moran were able to utilize the AMI contribution for purposes other than those intended by AMI.

Construction of the Towers was duly commenced by Mursor Builders. The construction contract called for substantial completion[14] of the work by July 21, 1973. Provision was made therein for time extensions. To obtain the same it was necessary for the supervising architect to submit to the FHA, prior to the effective date for substantial completion, a request for time extension and the reasons justifying said request. Time for completion could then be extended upon the prior written approval of the Commissioner. One such time extension was duly effected which extended the time for completion to August 23, 1973.[15] *Thereafter*, the supervising architect submitted to

---

[13] See, Pl. Exh. 3, Mortgagee's Certificate, FHA form No. 2434, line 7.

[14] Substantial completion is defined by the American Institute of Architects (AIA) General Conditions of the Contract for Construction, Pl. Exh. 2, as ". . . the date certified by the architect when construction is sufficiently complete . . . so the owner may occupy the work or designated portion thereof for the use for which it is intended." However, the construction contract expressly provides that its terms "shall take precedence over all inconsistent provisions in the AIA . . . General Conditions." Pl. Exh. 1, article 1A. The construction contract provides in article 2D that "[t]he date of substantial completion shall be the date the FHA chief Underwriter signs the final project inspection report."

[15] Pl. Exh. 20, FHA form No. 2437.

73

FHA a second request for time extension without any explanation of the purpose therefor.[16] Said request was signed by Rubin on behalf of Crown, Mursor Builders, and Leader; however, approval was never given by the FHA.[17] The request purported to extend the time for work completion to October 23, 1973.

The Virgin Islands government issued certificates for use and occupancy of the subject Towers buildings during September and early October of 1973. FHA representatives subsequently executed a permission to occupy form for the Towers which form was signed by Second Columbus, Mursor Builders, and Leader. Thereafter the supervising architect executed an AIA substantial completion certificate signifying October 29, 1973, as the operative date. Substantial completion was not certified by the FHA Chief Underwriter, however, until December 10, 1973, following inspection of the Towers project by federal personnel.

■■ It appears that September 1, 1973, marked the date of default by Crown on its repayment obligations under the Leader mortgage note. Although a remittance was made on October 11, 1973, the evidence indicates that the same was for a payment due in August. There is some indication in the testimony and documentary evidence that subsequent late payments were effected; however, there is no indication that any such remittances satisfied in full the monthly obligations of Crown subsequent to August 1, 1973. Owners' default must, therefore, be deemed to have occurred on September 1, 1973.[18] In addition, the

---

[16] Pl. Exhs. 21, 29.

[17] The construction contract provides in article 2A that "The time by which the work shall be completed may be extended in accordance with the terms of said AIA General Conditions *only* with the prior written approval of the Commissioner." (Emphasis supplied.)

[18] Although the pertinent agreements provide a thirty (30) day grace period to make whole delinquent payments, the failure to so comply renders the actual due date as the day of default thereunder.

owners failed to make the installment payments due under the promissory note to Mursor Builders on the first day of the month following (November 1, 1973) that month in which the Towers were certified by the local and federal government as being available for occupancy (October of 1973).

The aforenoted financial difficulties were employed by Rubin and Moran as justification for a request of AMI to inject additional liquid funds into the limited partnership. On October 8, 1973, AMI executed a continuing guarantee for loans to Second Columbus up to the sum of $50,000. Rubin and Moran, in their personal capacities, utilized said guarantee to obtain from the Bank of America in the principal amount of $43,820. As noted above, Rubin and Moran failed thereafter to employ said monies to meet the financial obligations imposed by the Mursor Builders promissory note and the Leader mortgage note, beyond effecting a late payment of $13,049.28 for the August interest installment due to Leader.

The supervising architect, Frederick, prepared a "punchlist" of construction work deficiencies to be rectified by Mursor Builders in order to attain "full completion" of the work. The architect included among said items repair work to twenty-four (24) above ground water cisterns which had displayed substantial leakage. The architect recommended that an escrow amount of $7,000. be retained from the final progress payment and ten percent (10%) retainages still due the contractor. The punch-list and escrow recommendation was forwarded to Miguel Badillo, Construction Inspector for the FHA at the HUD San Juan office. Badillo and Juan Laborde, Chief Construction Inspector, visited the site on December 7, 1973, to verify Frederick's representations. Despite observing severe leakage in the cisterns they issued on December 10, 1973, the FHA form 2449, Certificate of Substantial Completion.

75

A second visit was made by them on February 26, 1974, in order to observe the extent of progress made on the cistern repairs and to ascertain the amount of escrow to be retained. Badillo and Laborde wrote to Felipe Gorbea of the San Juan Operations Division recommending a total escrow retention of $50,000.[19] The operations division made a further increase in the recommended escrow to $76,000. This determination was communicated to the parties and a final closing date was contemplated for the near future whereupon all payments due Mursor Builders would be authorized by the FHA, less the escrow amount.

At this time HUD first became aware of the existence of the outside note extended to Mursor Builders. A tentative final closing date of July 1, 1974, was established; however, FHA demanded that during the interim period full disclosure of said note be made by all parties possessing knowledge thereof.

A meeting of the parties was held at the FHA San Juan offices on March 21, 1974. An agreement was reached whereby full disclosure of the note and security terms would be made, Mursor Builders would certify its construction costs to FHA, the owners would bring current their mortgage note obligations and the contractor would rectify all work deficiencies by July 1, 1974. The amicable setting did not last long, however. Moran and Mursor Builders began disputing the quality of the construction work and Murphy became recalcitrant regarding his FHA imposed obligation to certify actual construction costs and effect punch-list repairs prior to final closing. Suffice it to

---

[19] Repair to roof of Towers building No. 6 at $2,000.; Frederick's punch-list repairs valued at $7,333.66 *excluding* cistern repair work; cistern repair at $24,000. The total figure was multiplied by 1.5 to afford a repair value "cushion" thereby yielding a total escrow recommendation of $50,000. See, HUD Exh. P.

say that the contemplated final closing of July 1, 1974, never took place.[20]

In August of 1974 Mursor Builders exercised its rights under the pledge agreement and seized the stock of Second Columbus. A new board of directors was elected comprised of Murphy, one Robert Barber, and Andrew Sordoni. Rubin immediately notified AMI of Murphy's actions, having to also explain how Mursor Builders obtained the right to seize the Second Columbus stock and thereby gain entrance to the Crown partnership. AMI dispatched personnel to St. Thomas to investigate the Crown financial records in order to ascertain the manner in which its partnership contributions had been utilized by Rubin and Moran. It also appointed Moran, d/b/a Moran Realtors, as managing agent of the Towers.

FHA was advised of the stock seizure in September of 1974. It initiated an investigation as to whether Leader had had prior knowledge of the existence of the promissory note and pledge agreement. A civil action was commenced by Rubin and Moran to restrain Mursor Builders from disposing of the Second Columbus stock. Crown Mountain Apartment Associates, et al. v. Mursor Builders, et al., D.V.I., Div. of St. Thomas and St. John, Civil No. 74/94. An order of the District Court granting such relief for an indefinite period was vacated by the Court of Appeals for the Third Circuit pending disposition of Civil No. 75/67 [this opinion] wherein Mursor Builders sought to gain access to the corporate books of Second Columbus, and Civil No. 74/731 [this opinion] wherein Mursor Builders seeks to recover on the underlying promissory note. Crown Mountain Apartment Associates v. Mursor Builders, Inc., 11 V.I. 741 (3rd Cir. 1975). Civil No. 74/94 was thereafter dismissed by the District Court, permitting

---

[20] See, e.g., Pl. Exhs. 17, 41, 73, as well as HUD Exhs. J, K, and L.

Mursor Builders to retain the Second Columbus stock; however, plaintiff was denied access of the corporate books thereby precluding any attempt to dispose of the corporate assets.

The Towers cisterns continued to display leakage through 1974. By December 31, 1974, all latent defects in project construction had been remedied and an FHA twelve (12) month guarantee inspection report indicated that the project was fully completed by the close of 1974, save for the repainting of the cisterns to camouflage the continuous repairs made thereto. Moran subsequently expended $6,000. to effect said repainting.

Despite continuous efforts by Leader and FHA to rework the debt service terms of the mortgage note, Crown never cured its default thereunder. Leader eventually assigned its interest to the government, which in turn refused to release to Mursor Builders the unpaid retentions totalling $200,385. Additionally, there remains owing under the promissory note to Mursor Builders the principal sum of $180,879.

AMI was required to honor its guarantee of the repayment of the $210,000. note issued to the Kanawba Bank as well as its guarantee of the $43,820. note extended to the Bank of America. In addition, it expended a total of $69,277.45 in interest on monies borrowed to effect said principal repayments.

During the months following attainment of substantial completion by Mursor Builders through the end of 1977, the Towers project operated at less than full capacity. The accompanying loss of rentals was attributed by trial witness to a combination of several factors: (1) poor construction and the attendant unfavorable reputation of the Towers; (2) a devastating blow suffered by the local economy during the years following certain well-publicized murders in the Virgin Islands in 1972 and 1973; and, (3)

a general economic slump throughout the economies of the western world. It is impossible from the credible evidence introduced at trial to ascertain what portion, if any, of the loss in rental income stemmed from unworkmanlike construction. There was no credible evidence offered by the proponents of the claim for damages for loss rentals which established with a sufficient degree of specificity the nature of the rental economy in St. Thomas during the germane time period.

Finally, although defendants offered considerable testimony regarding alleged defects in project construction, it appears that but for the failure to repaint the cisterns, all construction was performed in compliance with the federally approved plans and specifications. Defendants' contrary assertions suffer, first, from a lack of credibility on the part of the germane defense witnesses, and secondly, from a pervasive inconsistency between the purported basis for expenditures made to remedy the construction work and notations made on the subject check stubs as to the actual purpose of such expenditures. It is emphasized that the testimony of Moran and Rubin is deemed inherently unreliable by the Court given the pattern of testimonial inconsistencies made by said parties during the depositional and trial stages of this litigation.

## III. CONCLUSIONS OF LAW

### A. THE CONSTRUCTION CONTRACT

Mursor Builders seeks to recover from Crown and its individual members the unpaid retentions, totalling $200,-385., due it under the construction contract. Additionally, Mursor Builders seeks pre-judgment interest thereon from the date it was entitled to payment and special damages incurred as a consequence of the purportedly wrongful retention. In addition to asserting various defenses to liability under the construction contract, defendants contend

that they are entitled to an offset for liquidated damages stemming from untimely substantial completion and compensatory damages owing to unworkmanlike construction and lost rentals.

■ Mursor Builders is clearly entitled to recover from Crown, the signatory to the construction contract, the retention monies due thereunder provided the contract has been "fully completed." In American Fidelity Fire Insurance Co. v. Construcciones Werl, 12 V.I. 325, 407 F.Supp. 164 (D.V.I. 1975) "fully completed" was defined as:

the *earlier* of "final closing", one year from the date of "substantial completion", or the date of correction of any defects due to faulty materials or workmanship which appear within one year from the date of "substantial completion". 407 F.Supp. at p. 181.

■ It is undisputed that final closing has yet to be consummated. As to the date of substantial completion, I must conclude that it occurred, not on October 19, 1973, as certified by the supervising architect, but on December 10, 1973, as certified by the Chief Underwriter of the FHA. I reach this conclusion for two reasons. First, the governing construction contract so provides. See, f.n. 14, supra. Plaintiff contends that where administrative delays account for a time lapse between the date certified by the supervising architect and the date of verification thereof by FHA officials, it would be unfair to penalize contractor for the same. However, no such evidence of administrative delay was introduced at trial. Furthermore, it is reasonable to assume that administrative delays are foreseeable and that it is anticipated, by the parties to the construction contract, that the building contractor will attempt to achieve substantial completion prior to the last day permitted for the same under the construction contract. My second reason for deeming December 10, 1973, as the date of substantial completion stems from the iden-

tity of interest between the supervising architect and Mursor Builders. The FHA determination to increase the escrow retention tenfold over the supervising architect's recommendation is indicative of the necessity for an independent determination by government authorities of the extent of work completion. Given the relationship between Frederick and Murphy, I am extremely reluctant to place much credence in the former's representations.

██ Substantial completion having occurred on December 10, 1973, and there having appeared construction defects within the ensuing year, "full completion" occurred on December 31, 1974, the date of correction of any defects due to faulty workmanship which appeared one year from the date of substantial completion. Accordingly, I hold that Mursor Builders was entitled to recover from Crown the sum of $200,385. as of said date. Inasmuch as said amount represented an identifiable sum of money recoverable as damages for a contractual breach, plaintiff is entitled to statutory legal interest from December 31, 1974. See, Restatement of Contracts, § 337; The Boathouse, Inc. v. Waggoner, D.V.I., Div. St. Thomas and St. John, Civil No. 373/1973 (Opinion filed Jan. 20, 1976); 1976 St. Thomas and St. John Supp. 24.

Plaintiff further maintains that it is entitled to special damages incurred as a consequence of the wrongful retention of said monies by defendants. Plaintiff relies upon § 346(2)(a) of the Restatement of Contracts which provides in pertinent part:

For a breach by one who has promised to pay for construction, if it is a partial breach the builder can get judgment for the instalment due, with interest; and if it is a total breach he can get judgment, with interest so far as permitted by the rules stated in § 337, for . . .

(a) The entire contract price and compensation for unavoidable special harm that the defendant had reason to foresee when

the contract was made, less installments already paid and the cost of completion that the builder can reasonably save by not completing the work; . . .

■ On the basis of said authority Mursor Builders claims entitlement to monies spent for legal advice, expert FHA consultants, miscellaneous travel expenses, and interest on loans procured to finance payment of debts to subcontractors, which items purportedly total $500,000. P. Brief at p. 28. I must deny Mursor Builders' request for said relief. What plaintiff fails to appreciate is the material role it played in occasioning the nonremittance of the contract retainages. Construction contracts such as that sued upon herein are in large measure sui generis. It is understood at the time of execution thereof by the contracting parties that the monies to be advanced during and after construction have as their source, not the owners of the project, but the lending institution which has agreed to finance the development of the project and then only with the approval of the government as mortgage loan insurer. Judicial appreciation of this contractual framework gave rise to the recognition of the contractor's ability to recover, as third party beneficiary under the building loan agreement, sums due it under the construction contract. Travelers Indemnity Company v. First National State Bank of New Jersey, 328 F.Supp. 208 (D.N.J. 1971); American Fidelity Fire Insurance Company v. Construcciones Werl, supra; Trans-Bay Engineers and Builders, Inc. v. Hills, 551 F.2d 370 (D.C. Cir. 1976); F. W. Eversley & Co. v. East N.Y. Non-Profit HDFC, 409 F.Supp. 791 (S.D. N.Y. 1976); Bennett Construction Co., Inc. v. Allen Gardens, Inc., 433 F.Supp. 825 (W.D. Mo. 1977); Spring Construction Co., Inc. v. Harris, 562 F.2d 933 (4th Cir. 1977).

In the matter sub judice plaintiff was denied prompt payment of the contract retainages for two principal reasons: (1) the existence of the promissory note to Mursor

Builders of which the government and Leader became aware upon or immediately prior to Mursor Builders' seizure of the Second Columbus stock; and (2) owners' default on their mortgage loan obligations, occasioned in part by lost rentals, in turn due in large measure to delayed and unworkmanlike performance by Mursor Builders. That the actions of Mursor Builders were among the causes of the special damages it now claims to have suffered, is clear from the record. Under such circumstances Mursor Builders cannot now recover for any such losses.

■■■■■ Crown contends that it is entitled to an offset for liquidated damages stemming from delayed substantial completion, as well as damages for loss rentals and unworkmanlike performance. Based upon the above finding that substantial completion occurred on December 10, 1973, it is clear from the terms of the construction contract that Crown is entitled to an offset of $589.08 for each day that substantial completion was delayed beyond the time called for in said contract for work completion. See, Pl. Exh. 1, Article 2C. In this regard plaintiff maintains that the second time extension, which purported to extend the time for work completion to October 26, 1973, and which was signed by Rubin on behalf of Crown, estops the partnership from asserting any earlier date as being operative.

In rejecting plaintiff's argument I note several factors which I deem of import. First, the supervising architect who requested the time extension had an identity of interest with Mursor Builders. Second, the time extension was not *sought* until well after the date on which work was to be completed. Third, no reason for the time extension appears on the request. Fourth, the governing construction contract provided that no such extension be

valid without "the prior written approval of the Commission." Fifth, there is no evidence that Rubin, by his signature, agreed to waive the requirement of FHA approval, and finally, there is no evidence whatsoever that Mursor Builders, but for the extension, would have completed work at an earlier date, or otherwise acted, in reliance upon Rubin's signature. See, Gateway Co. Inc. v. Charlotte Theatres, Inc., 297 F.2d 483 (1st Cir. 1961) (reliance established); Travis-Williamson County Water C & I Dist. v. Page, 358 S.W.2d 158 (Tex. Civ. App.), affirmed in part, rev'd in part on other grounds, 367 S.W.2d 307 (Tex. 1963) (reliance established); Universal Builders, Inc. v. Moon Motor Lodge Inc., 244 A.2d 10 (Pa. 1968) (reliance established). Defendants are, therefore, entitled to an offset against plaintiff's recovery for contract retainages in the amount of $64,209.72. Said sum represents the per diem liquidated damages amount of $589.08 multiplied by the number of days (109) that substantial completion exceeded the date on which such was to be achieved under the construction contract (July 21, 1973), as modified by the duly executed time extension (August 23, 1973).

▇▇▇ Defendant's claim of entitlement to damages for unworkmanlike construction and lost rentals is met with less favor by the Court. As to the former item, and as noted above in Part III of this opinion, defendants failed to establish that any of the alleged construction defects deviated from the work called for by the plans and specifications, save for the expenditure of $6,000. to repaint the cisterns. The remaining items of alleged unworkmanlike quality were either in accordance with the work required by the specifications or ultimately cured by Mursor Builders. It is noted that the burden of proof as to said issue was upon defendants and that the only wit-

nesses called by defendants either admitted to cure by Mursor Builders or suffered from a clear lack of credibility.

 The claim for loss rentals must also be rejected. In doing so the Court is fully cognizant of the liberal attitude evinced by the Restatement of Contracts, § 331 as to such claims. Again defendants had the burden in this regard. The subject of loss rentals was not incapable of proof. It would not have been difficult for defendants to establish the nature of the rental market for the subject premises during the germane time period. Yet no such effort was made beyond reliance upon one witness, whose credibility in this lawsuit was highly suspect, and the 1971 projection of rental income rendered by the FHA. Plaintiff, on the other hand, elicited from several witnesses the admission that the rental market during the subject period was very poor in the Virgin Islands. See, deposition of Edward Armstrong; trial test. of Alexander C. Naclerio. Although I feel that faulty construction played a role in retarding the rental income of the Towers, defendants have offered the Court no credible basis to calculate with *some* degree of certainty, the amount of damages to which they are entitled. See, Restatement of Contracts § 331, comment a.

Similarly, defendants failed to establish that any tenants at the Towers left the premises due to construction defects. The depositional testimony of one Ted Morey is of no use. Deponent presented a list of tenants who had purportedly vacated the Towers due to "water problems." However, upon cross-examination, it was admitted by the witness that the notations were, in fact, incorrect and that the tenants' leases had either expired or that they had left for some unrelated reason. In sum, although sympathetic with defendants' plight, the Court has not been presented with an evidentiary basis upon which a reasonable

calculation of lost rental damages can be effected. Plaintiff's recovery from Crown under the contract will be reduced by $6,000. to reflect the expenditure made by defendants to repaint the Towers cisterns. The judgment will award to Mursor Builders the sum of $130,175.78 with statutory interest thereon from December 31, 1974, reflecting contract retainages less liquidated damages and damages for defective construction.

■ To the extent that Crown is liable to plaintiff under the construction contract so, too, is Second Columbus liable as a general partner. See, 26 V.I.C., §§ 47, 209. Judgment shall be entered against Second Columbus in the amount of $130,175.28 with statutory interest thereon from December 31, 1974.

■ AMI, as a general partner in Crown, is also liable to Mursor Builders under the construction contract. AMI contends, however, that it did not become a partner in Crown until February 28, 1972, the date upon which the amended limited partnership agreement was filed with the local government. Said position is without merit. The only practical effect of filing a certificate of limited partnership is to shield the declared limited partners from personal liability for partnership debts. Prior to the filing of such a certificate all partners are subject to personal liability to third parties notwithstanding the provisions of the limited partnership agreement. Ruth v. Crane, 392 F.Supp. 724 (E.D. Pa. 1975); Lowe v. Arizona Power & Light Co., 427 P.2d 366 (Ariz. App. 1967); Bisno v. Hyde, 290 F.2d 560 (9th Cir. 1961) (applying Nevada law); Filesi v. United States, 352 F.2d 339 (4th Cir. 1965) (applying Maryland law). Thus, the issue remains, was AMI a partner in Crown on the day of execution of the construction contract.

 Clearly, the amended limited partnership agreement so provides in unequivocal language. AMI contends, however, that said agreement, when read together with the extraneous agreement executed contemporaneous therewith creates an ambiguity as to the date of AMI's admission, which ambiguity must be resolved after resort to the evidence as to the intent of the contracting parties. I am in accord with the legal principles advanced by AMI. A partnership is a relationship arising out of contract, Powers v. Celebrezze, 230 F.Supp. 81 (D.N.D. 1964); Whiteside v. Rooks, 197 F.Supp. 313 (D.N.Y. 1961), and under basic contract law, ambiguous contractual provisions must be interpreted in view of the actual intent of the contracting parties. This is especially so where, as herein, the issue is not that of partnership by estoppel inasmuch as AMI never caused itself or allowed itself to be held out to Mursor Builders as a partner, but rather that of the relationship inter sese. Pappas v. Klutinoty, 118 A.2d 202 (Pa. 1955); Eldridge v. Johnston, 245 P.2d 239 (Ore. 1952).

In viewing the totality of the evidence pertaining to said issue, I am compelled to conclude that AMI became a member of Crown on December 17, 1971, the date of execution of the limited partnership agreement. The testimony of Rubin and Moran in this regard is without any semblance of credibility. The testimony of AMI principals as to when it became a partner is without any semblance of consistency. No fewer than four interpretations as to the operative date of AMI's admission to Crown have been advanced. Under such circumstances it is virtually impossible to give effect to the intent of the contracting parties. See, f.n. 5, supra. I must conclude that the limited partnership included AMI as of December 20, 1971, that the extraneous agreement was executed to provide for indem-

nification between the contracting parties, and that said agreement was further intended to protect Rubin and Moran from any subsequent action by FHA for nondisclosure at initial closing of AMI's partnership interest. Accordingly, AMI, having become a general partner in Crown prior to the date of execution of the construction contract, is liable to Mursor Builders in the sum of $130,-175.28 with statutory interest thereon from December 31, 1974.

Mursor Builders also seeks to recover under the construction contract from Rubin and Moran notwithstanding their status as limited partners in Crown. Mursor Builders contends that the facts of this case indicate that Rubin and Moran exercised such a great degree of personal control over the affairs of the partnership that they should not be able to invoke the protective aegis of limited partnership status to escape personal liability for Crown's indebtedness.

Title 26 V.I.C., § 201 defines a limited partnership as "a partnership formed by two or more persons . . . having as members one or more general partners and one or more limited partners." Title 26 V.I.C., § 21 defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Title 26 V.I.C., § 1 defines person as including "individuals, partnerships, corporations, and other associations . . .". Title 26 V.I.C., § 212 provides "(a) a person may be a general partner and a limited partner in the same partnership at the same time . . .". Under the aforesaid statutory framework, it is apparent that a person may be both a limited partner and a director or officer of a corporation which in turn is a general partner in the same limited partnership. This being so, at what point, if at all, does a limited partner, by virtue of his control of partnership business as an officer of the corporate general partner, lose his status as a lim-

ited partner and thereby become liable to third parties as if he were a general partner?

Title 26 V.I.C., § 207, which is patterned after the Uniform Limited Partnership Act and which mirrors the relevant statutes in Washington and Texas provides:

A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, *he takes part in the control of the business.* (Emphasis supplied.)

The Supreme Court of Texas in Delaney v. Fidelity Lease Limited, 526 S.W.2d 543 (1975) held that the personal liability which attaches to a limited partner when he takes part in the control and management of the partnership business could not be evaded merely by acting through a corporate general partner. In so holding the Court rejected the argument that for personal liability to attach, a third party creditor must have relied upon the limited partner having held himself out as a general partner. The Court in addressing said contention stated:

[the statute] simply provides that a limited partner who takes part in the control of the business subjects himself to personal liability as a general partner. The statute makes no mention of any requirement of reliance on the part of the party attempting to hold the limited partner personally liable. 526 S.W.2d at p. 545.

The Supreme Court of Washington has reached a contrary conclusion. In Frigidaire Sales Corporation v. Union Reporters Inc., 562 P.2d 244 (1977), the Court held that absent some reliance by a third party creditor upon the actions of the limited partner which would lead the third party reasonably to believe that the limited party was, in fact, a general partner with attendant general liability, the fact that the limited partner as an officer of the corporate general partner managed the business of the partnership did not subject said limited partner to general liability. The Court stated:

89

For us to find that [the limited partners] incurred general liability for the limited partnership's obligations would require us to apply a literal interpretation of the statute and totally ignore the corporate entity . . . when [the third party] knew it was dealing with that corporate entity. There can be no doubt that respondents, in fact, controlled the corporation. However, they did so only in their capacities as agents for their principal, the corporate general partner. Although the corporation was a separate entity, it could act only through its . . . officers . . . Further, because [the limited partners] scrupulously separated their actions on behalf of the corporation from their personal actions, [the third party] never mistakenly assumed that [they] were general partners with general liability. 562 P.2d at p. 247.

 It is apparent that, despite efforts to distinguish and reconcile the above holdings, each represents a divergent view of the dominant consideration in determining the extent of liability of a nominal limited partner. The Texas court, in a literal reading of the statute, has made "control" the prime test; whereas the Washington court has looked to "creditor reliance." See, Feld, The "Control" Test for Limited Partnerships, 82 Harv. L. Rev. 1471 (1969). The facts of this case indicate that Mursor Builders at no time was led to believe that Rubin and Moran were liable as general partners. To the contrary Murphy required said individuals to personally guarantee the promissory note executed by Crown in favor of Mursor Builders. However, third party reliance is not the sole criterion. Some meaning must be given to the language embodied in § 207. I do not hold that merely by acting as officers of a corporate general partner, limited partners become subject to general liability. Rather, I hold that where, as herein, the corporate officers commingle partnership funds with personal funds, fail to maintain complete corporate and partnership financial records, utilize corporate and partnership funds for their personal enjoyment, and fail to maintain their corporate officer identity in conducting

partnership affairs, said limited partners become generally liable for the debts of the partnership irrespective of third party creditor reliance. Accordingly, Mursor Builders is entitled to recover from Rubin and Moran the sum of $130,175.28 with statutory interest thereon from December 31, 1974, under the terms of the construction contract.

## B. THE BUILDING LOAN AGREEMENT

 Mursor Builders seeks to recover undisbursed mortgage loan proceeds from Leader and the federal government under the terms of the building loan agreement entered into by Crown and Leader.

At the outset of trial, Leader moved to dismiss the complaint insofar as it asserted a cause of action against it, contending that, by virtue of it having assigned its interests in the building loan agreement to HUD, plaintiff's complaint fails to state a cause of action against Leader. Plaintiff claims that it can establish unjustifiable delay on the part of Leader in effecting the assignment and that it can prove that Leader had knowledge of the promissory note executed by Crown to Mursor Builders. Plaintiff asserts that to the extent such facts would not be attributable to HUD as assignee of Leader's interest, Leader should be held answerable to plaintiff. At the close of plaintiff's case in chief, Leader again moved to dismiss.

I find that plaintiff has failed to establish by a preponderance of the evidence that Leader unreasonably delayed its decision to assign its interest in the building loan agreement to HUD. I further find that plaintiff has failed to establish by a preponderance of the evidence that Leader was aware, by or prior to early 1974, of the existence of the promissory note and pledge agreement. Under such circumstances, I must grant Leader's motion to dismiss the complaint as to Leader pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Lindy v. Lynn, 395 F.Supp.

91

769 (E.D. Pa. 1974), aff'd., 515 F.2d 507 (3rd Cir. 1975); F. W. Eversley & Co. v. East N.Y. Non-Profit HDFC, 409 F.Supp. 791 (S.D.N.Y. 1976); Travelers Indemnity Co. v. First National State Bank of New Jersey, 328 F.Supp. 208, 214 (D.N.J. 1971); Bennett Construction Co., Inc. v. Allen Gardens, Inc., 433 F.Supp. 825, 832–33 (W.D. Mo. 1977); Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370 (D.C. Cir. 1976).

 Mursor Builders advances two bases for its claimed right to recover the undisbursed mortgage loan proceeds from HUD. First it contends that it is entitled to recover said monies under the traditional equitable lien and unjust enrichment theories. The facts of this case indicate otherwise. I hold that plaintiff is barred from invoking an equitable theory of recovery by virtue of its "unclean hands." It is, accordingly, unnecessary to decide whether the equitable lien route of recovery is limited to situations involving non-profit project sponsors as was the factual setting in American Fidelity Fire Insurance Co. v. Construcciones Werl, supra; Trans-Bay Engineers & Builders, Inc. v. Hills, supra; F. W. Eversley & Co. v. East N.Y. Non-Profit HDFC, supra; Bennett Construction Co., Inc. v. Allen Gardens, Inc., supra; and Spring Construction Co. v. Harris, supra.

 Plaintiff contends that it is entitled to the undisbursed mortgage loan proceeds by virtue of its status as a creditor third party beneficiary under the building loan agreement entered into by Crown and Leader. The government maintains that as a third party beneficiary, plaintiff stands in the shoes of the project sponsors and is, therefore, barred from any recovery under said legal theory due to the owners' breach of its contractual obligation to effect loan repayments. Accordingly, the government contends that Mursor Builders cannot require HUD,

as the assignee of Leader's interest, to remit the undisbursed mortgage loan proceeds. Trans-Bay Engineers & Builders, Inc. v. Hills, supra, at pp. 379–80.

In response to said argument plaintiff relied upon this Court's decision in American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc., supra at pp. 182–83. Plaintiff contends that despite owners' default, Leader and HUD insisted that Mursor Builders fully perform the construction work as a condition to a release of the ten percent (10%) contract retainages. As was stated by this Court in American Fidelity, supra, at page 182:

. . . the [contractor], who has succeeded to the legal position of its promise, has completed performance of the housing project. And while said performance may be "defective" in the sense that it was preceded by a default, nevertheless the law is clear that the "promisor's duty is not discharged by the defective performance of a condition or of a return promise if he accepts the performance with knowledge of or reason to know of the defects" . . . (Restatement of Contracts § 298 (1)).

Although it appears that plaintiff would otherwise be entitled to recover from the government under the aforesaid theory, Bennett Construction Co., Inc. v. Allen Gardens, Inc., supra at p. 834, I cannot countenance recovery by plaintiff from the public treasury (or purse) under the facts of this case. The equities dictate that plaintiff be required to look to the economically viable private parties for any recovery it might have.

The doctrine of third party beneficiary in the instant legal setting is not so rigid that resort to equitable considerations cannot be had. Not only does the doctrine of creditor-third party beneficiary have equity as its origin, the judicial refinement of rights and liabilities in factual settings reflected by the matter sub judice has been a function of flexibility and recognition of the sui generis nature of such transactions. See, e.g., American Fidelity

93

Fire Insurance Co. v. Construcciones Werl, supra at pp. 191–97 (special status afforded sureties in Praire-Henningsen line of cases); Travelers Indemnity Co. v. First National State Bank of New Jersey, supra (development of third party beneficiary theory in favor of sureties and contractors); Trans-Bay Engineers & Builders, Inc. v. Hills, supra (recognition of equitable lien in favor of contractor); F. W. Eversley and Co. v. East N.Y. Non-Profit HDFC, supra (relaxation of traditional liability of assignee).

Although the building loan agreement can be isolated and the liabilities of the parties thereto and their respective successors in interest ascertained in a rigid, conservative manner, it must be appreciated that all of the documents executed at an FHA initial closing are interrelated. The interests of the parties to all such contracts are intertwined. It is unrealistic to view the disclosure obligations of the contractor as limited to those matters as to which information is specifically requested of it. The contractor must appreciate at every stage of the processing of said contracts the very real interest HUD has in the project. It must also be appreciated by the parties that the purpose of disclosure requirements is to allow HUD to determine when financial and interrelational conflicts exist. For a party to aver that it did not deem disclosure necessary because it did not feel an identity of interest existed cuts against the clear overriding tenor of the contract provisions. All colorably pertinent information must be disclosed for it is within the discretionary exercise of HUD to ascertain what is and what is not permissible.

From the inception of the development of the Towers project it was the intention of the parties herein to utilize FHA insurance. It also appears from the evidence that it was their intention to withhold material information from HUD. Had the government been apprised of the actual

nature of the parties' dealings it clearly would never have become involved in the Towers project. Under such circumstances plaintiff cannot be permitted to recover from HUD. It must obtain its legal redress from the party with whom it chose to enter into a contractual relationship.

## C. THE PROMISSORY NOTE

Plaintiff seeks to recover the sum of $180,879. plus statutory prejudgment interest thereon, under the terms of the promissory note executed by Rubin and Moran on behalf of Second Columbus as managing general partner of Crown. Recovery is sought against the Crown partnership and its members, Second Columbus, AMI, Rubin and Moran. Plaintiff also contends that Rubin, Moran, and Evelyn Moran, as personal guarantors of the note, are individually liable thereunder.

Defendants have raised several defenses to plaintiff's claim. First, they contend that the note is not yet due. They read the note to require the payment of $80,900. at initial closing, $50,000. at final closing, which has yet to be consummated, and the balance of $130,879. thereafter through installments. The terms of the promissory note clearly provide otherwise.[21] The installment payment ob-

---

[21] The note provided for payment of $261,799. as follows:

(1) The sum of $80,900., without interest, on the date of initial closing, prior to commencement of construction;

(2) The sum of $50,000., without interest, upon completion of the improvements and at the final mortgage closing;

(3) The balance of $130,879. in two stages: (a) Within fifteen (15) days after the first day of each month not less than seventy-five percent (75%) of all monies for rent, escrow or advance rentals for apartments at the project shall be delivered to the appointed Escrow Agent and applied to reduce the principal balance due. No interest shall be assessed during the period of construction and until the entire apartment project shall be available for occupancy; (b) On the first day of the month following that month in which all of the buildings are available for occupancy, the remaining balance due (less $50,000. due under paragraph 2) would commence to bear interest at the rate of seven percent (7%) per annum and payments towards reduction of the principal and interest should be made on the first day of each succeeding month in an amount which would pay the balance of the principal and interest in not more than sixty (60) months from the date of the first payment under paragraph 3(b) or at the rate of $2,000. per month, whichever was greater.

ligations on the "balance" of $130,879. became due on the first day of the month following that month in which the Towers became available for occupancy. The terms of the note make no reference to "substantial completion date" as the operative date on which the installments became due. Accordingly, I hold that, inasmuch as the Towers were certified as available for occupancy during September and October of 1973, the initial installment payment was due on the first day of the following month—November 1, 1973. Under the terms of the note all payment obligations were accelerated and due as of December 1, 1973.

 Defendants contend that the stock seizure by Mursor Builders constituted satisfaction and extinguishment of the underlying debt and that plaintiff's failure to dispose of the stock shares impaired their value. As to the former contention, defendants' position is clearly without merit. Plaintiff's seizure of the Second Columbus stock cannot in and of itself be deemed an election to retain the same in full satisfaction of defendants' debt. Mursor Builders was entitled to hold the collateral and pursue as many consistent remedies available to it in order to satisfy the debt. Abdallah v. Abdallah, 359 F.2d 170 (3rd Cir. 1966); In re Adrian Research and Chemical Company, 269 F.2d 734 (3rd Cir. 1959). As to the latter contention, it must again be noted that by virtue of the court order in Civil No. 75/67 Mursor Builders was barred access to the Second Columbus financial records thereby preventing plaintiff from ascertaining the net worth of said corporation. It would have been foolhardy for plaintiff to effect any disposition of the collateral without knowledge of its value. Under the circumstances Mursor Builders took the only reasonable course of conduct available by simply retaining the Second Columbus stock in its possession.

Defendants contend that the promissory note and pledge agreement were given to Mursor Builders under duress, and that the stock seizure made performance under the note impossible. Both of the aforesaid positions are totally without credible evidentiary support. Defendants' position is that they are not liable under the note inasmuch as it was not supported by adequate consideration. The factual circumstances surrounding the execution of said note reveal that the execution thereof was for good consideration, that is plaintiff's promise to defer its right to payment in full for its construction services.

 Certain of the defendants contend that plaintiff's failure to effect presentment thereof obviate their liability thereunder as accommodation makers. By the unequivocal language utilized in the note, it is clear that Rubin and the Morans assumed the position of guarantors and not that of accommodation makers. Under such circumstances presentment was unnecessary.

 Finally, defendants urge that non-disclosure of the note to HUD bars its enforceability. Defendants advance the argument that the failure to disclose rendered the note illegal or, alternatively, violative of public policy considerations. Defendants find support for their position in Sections 571 and 598 of the Restatement of Contracts. Section 571 provides:

A bargain to commit a tort or in consideration of the commission of a tort, or to interfere with rights belonging to the public, or in consideration of interference with such rights is illegal.

Section 598 provides:

A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value. . . .

97

No legislation provides for the unenforceability of the subject transaction. To be sure the desire to achieve full disclosure of all material information in FHA insured housing construction loans would be furthered to some extent by a refusal to enforce the note. However, the Court is of the opinion that *as between plaintiff and the non-federal defendants,* the expectations of the parties in entering into the note agreement and the forfeiture which plaintiff would suffer from unenforceability outweigh any public policy against enforcing the note.

The tentative draft of the Restatement of Contracts provides:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

Restatement of the Law, Second, Contracts § 320, Tent. Draft No. 12 (March 1, 1977).

98

It was the expectation of the parties to the note and pledge agreement that Mursor Builders would agree to construct the Towers project and would further agree to defer, until a date post construction, payment in full for its services. To refuse to enforce said agreement would result in a windfall to defendants in the amount of $180,879. plus interest. Under the entire factual setting herein, the Court is of the opinion that defendants are least deserved of windfall gain and that the expectations of the parties outweighs the public's interest in unenforceability of the subject note. Moreover, the duty of disclosure of the note to HUD rested primarily on defendants. For defendants to now seek to avoid any liability on the note due to *their* failure to disclose the same is incongruous, to say the least. Accordingly, judgment shall be entered on Count I in favor of plaintiff and against defendants Rubin, Roger Moran, and Evelyn Moran, as guarantors of the note, in the sum of $180,879. plus interest from November 1, 1973. Judgment shall be entered on Count II in favor of plaintiff and against the Crown partnership members in the sum of $180,879. plus interest from November 1, 1973.[22] Upon satisfaction of said judgments plaintiff shall return to Second Columbus the stock shares heretofore held as security.

## D. AMI/CROWN CROSSCLAIM AGAINST RUBIN AND MORAN

AMI, on its own behalf and, alternatively, on behalf of Crown, seeks to recover the sum of $398,983.49 from

---

[22] AMI contends, in its crossclaim, that it is entitled to recover damages from Rubin and Moran, equal in amount to any recovery by plaintiff from AMI, due to the fraudulent and willful misconduct of said individuals in executing the promissory note and pledge agreement. However, AMI does not contend that the misconduct of Rubin and Moran, and Mursor Builders' knowledge of the unauthorized nature of their actions, work to obviate any partnership liability to plaintiff under the promissory note. Accordingly, said issue is not reached herein.

Rubin and Moran. AMI contends that it was fraudulently induced by Rubin and Moran into joining the Crown partnership and that it is accordingly entitled to recover $253,-820. which sum represents the principal repayments made by AMI on the notes extended by Rubin and Moran to the Kanawba Bank and the Bank of America. AMI further asserts that it should recover the sum of $69,277.45 representing interest payments which it made on monies borrowed to effect said principal repayments. Finally, AMI contends that, having been denied the use value of said funds, it is entitled to recover $75,886.04, the statutory interest rate thereon. On behalf of Crown AMI claims that Rubin and Moran misappropriated $253,820. of partnership funds and denied Crown the use value thereof equal to $75,886.04.

▬ AMI's crossclaim, additionally, sets forth a claim for indemnification against Rubin and Moran for any recovery had by plaintiff from AMI. Said indemnity claim is *not* based upon the terms of the amended limited partnership agreement, nor upon the indemnity clauses of the extraneous agreement executed contemporaneously with the partnership agreement. Rather, it is based upon the allegedly tortious conduct of Rubin and Moran. Accordingly, the *contractual* liability of Rubin and Moran to AMI is not reached herein.

As to AMI's tort claims, it is apparent from the facts of this case that Rubin and Moran misrepresented certain factual matters to AMI at the meeting in Roanoke, Virginia and that Rubin and Moran thereafter misappropriated partnership assets. However, AMI is precluded from pressing its crossclaim until such time as it brings an equitable action for an accounting and settlement of partnership assets and affairs.

 An action at law ordinarily is not maintainable between partners on any claims arising out of partnership transactions until the partnership business is wound up and the partnership accounts finally settled. Friedman v. Golden Arrow Film, Inc., 442 F.2d 1099, 1107–08 (2nd Cir. 1971); Coast v. Hunt Oil Co., 96 F.Supp. 53 (W.D. La.), aff'd., 195 F.2d 870 (5th Cir.), cert. den., 344 U.S. 836 (1952); Knapp v. First National Bank & Trust Co., 154 F.2d 395 (10th Cir. 1946); Johnson v. Johnson, 82 F.Supp. 915 (E.D. Pa. 1949). Similarly, a court of equity will not interfere with internal partnership affairs except with a view to dissolution of the partnership and the effectuation of an accounting and settlement of the partnership affairs. The exceptions to said rule pertain to situations involving partnerships formed for a single, consummated business purpose and in which the existence of unknown third-party creditors is not a legitimate concern. Such does not exemplify the circumstances of the Crown partnership. Accordingly, AMI must defer its attempt to recover from Rubin and Moran until such time as it chooses to maintain an action for an accounting and settlement of the Crown partnership affairs.

### JUDGMENT AND ORDER

In accordance with the reasons set forth in the Memorandum Opinion of even date herewith it is hereby

ORDERED, ADJUDGED and DECREED

(1) That with respect to Count I of the Second Amended Complaint, Mursor Builders, Inc., recover from Roger F. Moran, Evelyn J. Moran and Irvin Rubin, jointly and severally, the sum of $180,879. plus statutory interest thereon from November 1, 1973, each party to bear their own costs of action;

(2) That with respect to Count II of the Second Amended Complaint, Mursor Builders, Inc., recover from Crown Mountain Apartment Associates, American Motor Inns, Inc., The Second Columbus Corporation, Roger F. Moran and Irvin Rubin, jointly and severally, the sum of $180,-879. plus statutory interest thereon from November 1, 1973, each party to bear their own costs of action;

(3) That with respect to Count III of the Second Amended Complaint, Mursor Builders, Inc., recover nothing from Patricia Roberts Harris, Secretary of the Department of Housing and Urban Development, each party to bear their own costs of action;

(4) That with respect to Count IV of the Second Amended Complaint, the date of substantial completion of the construction contract is December 10, 1973;

(5) That with respect to Count VI of the Second Amended Complaint, Mursor Builders, Inc., recover from Crown Mountain Apartment Associates, American Motor Inns, Inc., The Second Columbus Corporation, Roger F. Moran and Irvin Rubin, jointly and severally, the sum of $130,-175.28 with statutory interest thereon from December 31, 1974, each party to bear their own costs of action;

(6) That with respect to Count VIII of the Second Amended Complaint, Mursor Builders, Inc., recover nothing from Patricia Roberts Harris, Secretary of the Department of Housing and Urban Development, each party to bear their own costs of action; and

IT IS FURTHER ORDERED

(7) That the motion of The Leader Mortgage Company for unvoluntary dismissal of that portion of Count III of the Second Amended Complaint which avers a claim against movant be and the same is hereby GRANTED, costs of action to be awarded to The Leader Mortgage Company upon submission of a bill of costs and attorneys' affidavit as to time spent;

(8) That pursuant to the stipulation of the parties Count V of the Second Amended Complaint be and the same is hereby DISMISSED;

(9) That pursuant to the stipulation of the parties Count VII of the Second Amended Complaint be and the same is hereby DISMISSED; and

(10) That the crossclaim of American Motor Inns, Inc., against Irvin Rubin and Roger F. Moran, be and the same is hereby DISMISSED WITHOUT PREJUDICE, each party to bear their own costs of action.